George E. STREET, Plaintiff-Appellee,

v.

ISTHMIAN LINES, INC., Defendant-Appellant.

No. 62. Docket 27556.

United States Court of Appeals Second Circuit.

Argued Oct. 22, 1962.

Decided Jan. 30, 1963.

Joseph M. Cunningham, of Kirlin, Campbell & Keating, New York City (Vernon S. Jones, Henry J. O'Brien, New York City, of counsel), for defendant-appellant.

Israel G. Seeger, of Miller & Seeger, New York City (Albert V. Testa, New York City, of counsel), for plaintiff-appellee.

Before LUMBARD, Chief Judge, and MOORE and HAYS, Circuit Judges.

HAYS, Circuit Judge.

This is an appeal by defendant, Isthmian Lines, Inc., from a judgment for plaintiff after a trial before a jury. The action was brought by a merchant seaman engineering officer to recover damages for the loss of the sight of his left eye as the result of an injury sustained while aboard the S.S. Andrew Jackson, a vessel owned by the Waterman Steamship Company and bareboat chartered, operated and controlled by defendant.

Suit was predicated on the unseaworthiness of the vessel and on defendant's negligence under the Jones Act (46 U.S.C. § 688). Plaintiff employed by defendant as a junior third assistant engineer aboard the Jackson, had been going to sea since 1942. He had a Marine Engineer's license since 1949. On December 25, 1956, the vessel arrived in New Orleans after a voyage in the Far East and representatives of the owners of the vessel came aboard for the purpose of effecting redelivery. On the morning of December 26th, the work to which plaintiff was assigned was the removal of certain view plates from one of the vessel's boilers in order to permit the owner's representatives to examine the boiler. The only tools that plaintiff needed for this work were wrenches and a hammer. After plaintiff began to work on the boiler, the first assistant engineer locked all the tools in the tool shop with the exception of a few wrenches, a hammer and a cold chisel. On the day before, the first assistant engineer had found a sack of valuable dies cached in the engine-room, hidden away apparently in preparation for theft. To safeguard the rest of the tools, he locked the tool room. At about 11:15 A. M. plaintiff was approached by two men, who plaintiff knew were not members of the crew but who appeared to him to be longshoremen. They showed him a turnbuckle and asked him to cut an end off. Plaintiff assumed that in cutting off the end of the turnbuckle for these men he would be helping the cargo operations. Accordingly, he agreed to do so and went to the machine shop to get a hacksaw. Finding none there, he went to the log desk, several feet away, looking for the toolroom key, which usually hung on a rack above the engineer's log desk. Not finding the key there, plaintiff started back to the machine shop and met the first assistant engineer on the way. He told the first assistant

that he wanted a hacksaw to cut off the end of the turnbuckle "for these two fellows there", and asked him for the key to the tool shop. The first assistant told him that the key was in his room and that he was too busy to get it for him. Plaintiff did not attempt to get the key because, he testified, the first assistant kept his room locked and he did not have access to it nor permission to enter. He thereupon returned to the machine shop and found a cold chisel. He "figured I would do it as quick [with the chisel]. Then I had to dress it up on the emery wheel." He put an anvil on the deck, placed the turnbuckle on the anvil and, holding the turnbuckle down with the left foot, began to cut through the thin neck of the turnbuckle with the hammer and chisel. As he made the last cut, the end bounced off the surface of the anvil and struck him in the eye. At the end of plaintiff's case, the trial judge dismissed the unseaworthiness claim and reserved decision on the negligence question. At the end of the entire case, he advised counsel that he had reconsidered his previous dismissal of the unseaworthiness claim and was going to allow it to go to the jury along with the negligence claim. Appellant contends that this was error, and that the complaint should have been dismissed in its entirety. We hold that both issues were properly submitted to the jury.

In the course of the trial the first assistant engineer on the vessel, who had been going to sea since 1941, and had been an engineer since 1949, testified that a hacksaw was the "proper" tool to use for the purpose for which the plaintiff used the cold chisel, and that he would have used a hacksaw. Moreover, the plaintiff himself first went to look for a hacksaw, and resorted to the chisel and hammer only when he found that the hacksaw was not available. On the basis of this evidence and its own experience,[1]

---

1. As Judge McGohey correctly stated in the course of the trial, the jury could infer "from what happened here, based on their own experience in life, that this kind of operation that this man did, whether he thought it was dangerous or

the jury, "which plays a pre-eminent role in these Jones Act cases," [2] could find that a cold chisel was not a reasonably fit and safe tool for the purpose to which it was put.

Ferguson v. Moore-McCormack Lines, Inc., 352 U.S. 521, 77 S.Ct. 457, 1 L.Ed. 2d 511 (1957), a decision heavily relied on by the district court, is directly in point. There plaintiff, a baker, was injured in the course of using a butcher knife to remove from a container some ice cream which was too hard to be removed by the scoop ordinarily used for the purpose. Plaintiff recovered a verdict in the trial court, but this Court reversed and ordered dismissal. 2 Cir., 228 F.2d 891. The Supreme Court reversed our determination and ordered the verdict reinstated. After reviewing the evidence, the Court said:

> "Respondent urges that it was not reasonably foreseeable that petitioner would utilize the knife to loosen the ice cream. But the jury, which plays a pre-eminent role in these Jones Act cases (Jacob v, New York City, 315 U.S. 752 [62 S.Ct. 854, 88 L.Ed. 1166]; Schulz v. Pennsylvania R. Co., 350 U.S. 523 [76 S.Ct. 608, 100 L.Ed. 668]), could conclude that petitioner had been furnished no safe tool to perform his task. It was not necessary that respondent be in a position to foresee the exact chain of circumstances which actually led to the accident. The jury was instructed that it might consider whether respondent could have anticipated that a knife would be used to get out the ice cream. On this record, fair-minded men could conclude that respondent should have foreseen that petitioner might be tempted to use a knife to perform his task with dispatch, since no adequate implement was furnished him. See Schulz v. Pennsylvania R. Co., 350 U.S. 523, 526 [76 S.Ct. 608, 100 L.Ed. 668]. Since the standard of

liability under the Jones Act is that established by Congress under the Federal Employers' Liability Act, what we said in Rogers v. Missouri Pacific R. Co., ante, p. 500 [77 S.Ct. 443], decided this day, is relevant here:

> " 'Under this statute the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought.'
>
> "Because the jury could have so concluded, the Court of Appeals erred in holding that respondent's motion for a directed verdict should have been granted. 'Courts should not assume that in determining these questions of negligence juries will fall short of a fair performance of their constitutional function.' Wilkerson v. McCarthy, 336 U.S. 53, 62 [69 S.Ct. 413, 93 L.Ed. 497]." 352 U.S. at 523–524, 77 S.Ct. at 458.

As in the case at bar, there was no defect in the tool selected, nor was the tool "unfit" in the sense that it could not accomplish the task. But as in the case at bar, the jury could conclude from the circumstances of the accident that plaintiff "had been furnished no *safe* tool to perform his task", 352 U.S. at 523, 77 S.Ct. at 458 (emphasis supplied).

In Jacob v. New York City, 315 U.S. 752, 62 S.Ct. 854, 86 L.Ed. 1166 (1942), plaintiff was injured when the wrench he was using fell on his toe. In reversing a judgment dismissing the complaint the court said:

> "The right of jury trial in civil cases at common law is a basic and fundamental feature of our system of federal jurisprudence which is protected by the Seventh Amendment. A right so fundamental and sacred to the citizen, whether guar-

not, was, in fact dangerous and that this tool was, in fact, inadequate to do that job safely."

2. Ferguson v. Moore-McCormack Lines, Inc., 352 U.S. 521, 523, 77 S.Ct. 457, 1 L.Ed.2d 511 (1957).

anteed by the Constitution or provided by statute, should be jealously guarded by the courts. The present case is a suit by petitioner under the Jones Act for personal injuries sustained when he fell because the wrench he was using to tighten a nut slipped under the torque applied to it. We are called upon to determine whether on the evidence adduced by petitioner, and in contravention of accepted juridical standards, petitioner was wrongfully deprived of his statutory right to jury trial by the action of the trial court in dismissing his complaint, thereby refusing to submit the case to a jury which had been duly empanelled to try it. [315 U.S. at 752–753, 62 S. Ct. at 854 (footnotes omitted).]

\* \* \* \* \* \*

"[I]t was for the jury to decide whether a monkey wrench was a reasonably safe and suitable tool for petitioner's work. \* \* \* Without doubt the case is close and a jury might find either way. But that is no reason for a court to usurp the function of the jury. We are satisfied that a due respect for the statutory guaranty of the right of jury trial, with its resulting benefits, requires the submission of this case to the jury." 315 U.S. at 756, 62 S.Ct. at 856 (Emphasis supplied.)[3]

See also Salem v. United States Lines Co., 370 U.S. 31, 82 S.Ct. 1119, 8 L.Ed. 2d 313 (1962); Petterson v. Alaska S.S. Co., 205 F.2d 478 (9th Cir. 1953); affirmed, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798 (1954).

 Appellant makes much of plaintiff's testimony, under cross-examination, that he did not, at the time, think it was dangerous to use a cold chisel as he did. This testimony, like other testimony, was for the jury to weigh and consider with the rest of the evidence. It did not, as appellant appears to contend, require the court to dismiss the complaint.

The burden of selecting proper tools is not upon the seaman. We agree with the statement of the rule in Cox v. Esso Shipping Co., 247 F.2d 629 (5th Cir. 1957), cited with approval in Michalic v. Cleveland Tankers, Inc., 364 U.S. 325, 327, 328, 81 S.Ct. 6, 5 L.Ed.2d 20 (1960). Cox was injured while using a block of the wrong type for the operation in which he was engaged. The charge of the trial court was held to be error:

"Putting on the seaman, as it did, the burden of selecting gear, appliances and tackle to be used, or inspecting that furnished by the vessel to ascertain whether it was suitable, it was a virtual abandonment of the traditional notions, long expressed, that the vessel is under an absolute duty to supply and keep in order tools and appliances, must furnish a seaworthy ship and seaworthy appliances. The Osceola, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760; Mahnich v. Southern S.S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561, 1944 A. M. C. 1; Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099, 1946 A. M. C. 698. The obligation to furnish the gear was on the vessel. The bosun undertook to furnish it. If through the bosun the shipowner did not comply with the heavy obligation to provide seaworthy equipment, it was not the duty of the seaman to select it or pick from the good and bad." 247 F.2d at 635–636.

Appellant's remaining points are without merit.

Affirmed.

---

3. Although in both Ferguson and Jacob the complaint sounded only in negligence, it is clear that the rationale of the Court's opinions applies equally to claims of unseaworthiness.