Samuel MOSLEY, Plaintiff-Appellee,

v.

CIA. MAR. ADRA, S.A., Defendant-Appellant and Third-Party Plaintiff-Appellee,

v.

LIPSETT STEEL PRODUCTS, INC., Third-Party Defendant-Appellant.

No. 78, Docket 27651.

United States Court of Appeals Second Circuit.

Argued Oct. 31, 1962.

Decided Feb. 28, 1963.

4. Benson v. Ribicoff, 201 F.Supp. 189 (D.C.N.D.)

**224**

Edward J. Behrens, New York City (Gay & Behrens, New York City, on the brief; Charles H. Lawson, New York City, of counsel), for plaintiff-appellee.

Victor S. Cichanowicz, New York City (Cichanowicz & Callan, New York City, on the brief), for defendant-appellant and third-party plaintiff-appellee.

Vincent A. Catoggio, New York City (Purdy, Lamb & Catoggio, New York City, on the brief), for third-party defendant-appellant, Lipsett Steel Products, Inc.

Before CLARK, FRIENDLY and MARSHALL, Circuit Judges.

MARSHALL, Circuit Judge.

This is an appeal by the defendant, Cia. Mar. Adra, S.A., and the third-party defendant, Lipsett Steel Products, Inc., from a judgment of $80,000 entered in favor of the plaintiff, Samuel Mosley, in the United States District Court for the Southern District of New York after a trial before Judge Cooper and a jury.

Mosley is a longshoreman who was injured on October 15, 1956, while engaged in loading a cargo of scrap metal aboard the foreign flag ship S.S. Turmoil, which lay moored in Port Newark Bay, N. J. He brought suit against Adra, owner and operator of the vessel, alleging in his complaint two causes of action, one based upon negligence and the other upon unseaworthiness. Adra then filed a third-party complaint against Lipsett, the stevedoring contractor which employed Mosley, seeking indemnity from Lipsett for any recovery which Mosley might have. Cf. Ryan Stevedoring Co. v. Pan-Atlantic Steamship Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956). At the close of plaintiff's case, the trial judge directed a verdict in favor of Adra against Mosley on the cause of action based upon negligence. He declined to direct a verdict on the cause of action based upon unseaworthiness, however, and that issue was submitted to the jury. The jury returned a general verdict of $80,000 in favor of Mosley against Adra on the original complaint and in favor of Adra against Lipsett for indemnity in the same amount on the third-party complaint.

Adra appeals from plaintiff's judgment on the original complaint, urging in the alternative that if the judgment is affirmed, the judgment on the third-party complaint awarding it indemnity against Lipsett also be affirmed. Adra also contends that the trial judge erred in refusing to amend its judgment against Lipsett to include an award for counsel fees, disbursements, and costs required for the defense of the case. Lipsett appeals from the judgments on both the original complaint and on the third-party complaint. Mosley, relying upon his judgment on the unseaworthiness count, has not appealed from the action of the trial judge in directing a verdict against him on the negligence count.

Because Mosley was working alone in the 'tween deck at the time he was injured and because both Adra and Lipsett rested at the conclusion of plaintiff's case without putting in any evidence of their own, the description of the accident which was before the jury came solely from Mosley. He testified ·that his job in the 'tween deck was to direct the placing of a steel chute after each "shot" of scrap metal was dumped down it; when one area of the 'tween deck became filled with scrap metal, he would direct the chute toward another area in order to insure an even distribution of the cargo. At the close of the day prior to the accident, a load of scrap metal had been placed in the square of the hatch of the 'tween deck to a height of three-and-a-half or four feet, partially blocking the entry of natural light into the 'tween deck.

Mosley reported for work the following morning at his usual hour of shortly before eight o'clock, set up the chute, and participated in the completion of the first shot. The accident occurred at nine-thirty or ten o'clock during the loading of the second shot. At the time, Mosley testified, there was neither natural light at the spot where he was injured nor artificial light anywhere in the 'tween deck. An expert witness for the plaintiff testified that it was the custom and practice for merchant vessels to carry portable lights as part of their normal equipment and to use them in the 'tween deck when the natural light was not sufficient. There was no evidence that the S.S. Turmoil possessed such lights or that, if it did, Mosley asked that they be installed or turned on.

During the course of the loading of the second shot, a piece of metal—thought by Mosley to be "a piece of rear end of some sort of a car transmission"—became lodged or wedged about three feet from the mouth of the chute, blocking the free flow of scrap metal. Mosley was standing at the time about twenty feet from the chute. He told the foreman to suspend the loading operation so that he could free the obstructing piece of metal. Then, he said, he "reached in the back of me, which I have a hook" that he intended to use in clearing the chute. The hook was not introduced into evidence; Mosley described it as a large piece of iron, like a pipe, three-quarters of an inch thick and five or six feet long, fashioned at each end "into a round shape, in the order of a ·walking-cane handle"—"one this way, one out." He said it was not a manufactured instrument, but had been picked up out of the scrap metal and improvised into its present form. No evidence was introduced as to who owned the hook or who furnished it to Mosley.

Equipped with the hook, Mosley approached to within four or five feet of the chute and stationed himself on pieces or "portions" of ·scrap metal that had been loaded on the deck, attempting to make sure that he had "the very best [footing] I possibly could" under the circumstances. Then, he told the court, "I taken my hook, fastened it around the top of this metal, and I went to pull upon this hook in order to remove this piece of metal out of there, but in so doing, pulling as hard as I did, my feet begin to slip, and as I started to slip the hook slipped off and I fell." He said his feet were caused to slip by the "metal that I was standing upon on deck." Because of the absence of light, Mosley said, the 'tween deck was dark

and "I couldn't see anything there," including the metal that was underfoot.

"Mosley: Well, first when you are working under something, you cannot see, you would take and set your feet as best you possibly can, whatever you are standing on.

"The Court: Yes, I know, but he [counsel] wants to know on this particular occasion how did you set yourself.

"Mosley: I set myself on this particular occasion, as best I could with the footing, with the metals under my feet, to get a proper leverage, so as to have a foundation to stand upon to pull this steel out.

\* \* \* \* \* \*

"In standing upon scrap metal in the area in which you cannot see, you can't get no proper—say how you are standing. You are trying to make your foot as secure as you possibly can. Therefore I cannot say my feet was on here or there or what."

He admitted that he "definitely" knew that he was standing on "some sort of scrap" and could feel it under his feet. But he did not try to scrape any of the metal away, he said, because "you can't scrap much metal away" and "to scrape all that metal out of there would take about five minutes, because you are loading scrap metal."

Mosley fell backward and felt pains in his neck, back, legs, hands, and right thigh; subsequently, in 1957, he underwent a cervical laminectomy to remove an obstruction in his back created by a ventral herniated disc. He has not worked since. .

We deal first with the question of the validity of Mosley's judgment against Adra on the unseaworthiness count because, as we shall indicate, we find it dispositive of all the issues raised on this appeal.

The factual theory by which Mosley sought to establish the unseaworthiness of the S.S. Turmoil was not precisely outlined at trial. In his brief on appeal, however, he relies upon two alternate grounds as supporting the judgment of the District Court. These grounds are (1) that "he was working in semi-darkness and could not see even the type of scrap upon which his feet were placed," and (2) that "the hook was improvised and peculiar with a tendency to destroy the normal line of force and not suited to the task." He underscores his reliance upon these two grounds by saying at another point in his brief, "Mosley's injury was caused by absence of light or the odd hook, or both."

That these two grounds were understood by the jury as being important to plaintiff's case and offering alternate bases of recovery seems apparent from the transcript. Mosley was questioned on direct examination and on cross-examination as to both the adequacy of the lighting and the quality of the hook. Counsel for Mosley, counsel for Adra, and counsel for Lipsett each undertook in his summation to the jury to address himself to the relevance and force of the evidence adduced on both grounds. And the District Judge, in charging the jury on unseaworthiness, indicated his understanding that plaintiff was relying upon both grounds by saying:

"What were the conditions aboard the vessel at the time of the accident, and how did they compare with the standard which the law imposes.

"Was the lighting adequate?

"What about the hook with which the testimony deals?"

The District Judge did not mention the hook at any other point in the charge, nor did he make any effort to relate this statement to the governing principles of unseaworthiness.

Because the jury's verdict was a general one, it is not possible to know upon which of these two alternate grounds it predicated the finding of unseaworthiness necessary to support Mosley's verdict against Adra. In these circumstances

it is the duty of an appellate court to examine the adequacy of both grounds. Stokes v. United States, 264 F. 18, 23 (8 Cir., 1920); Atlantic Coast Line R. R. Co. v. Tiller, 142 F.2d 718, 722 (4 Cir., 1944), reversed on other grounds, 323 U.S. 574, 65 S.Ct. 421, 89 L.Ed. 465 (1945). If one of the grounds is found adequate and the other inadequate as a matter of law, the judgment must necessarily be reversed since "there is no way to know that the invalid claim of unseaworthiness was not the sole basis for the verdict." United New York and New Jersey Sandy Hook Pilots Association v. Halecki, 358 U.S. 613, 619, 79 S. Ct. 517, 519–520, 3 L.Ed.2d 541 (1959).

■ We have undertaken that examination and concluded that although the evidence presented in the District Court may have been adequate to support a finding that the S.S. Turmoil was unseaworthy because of the condition of the lighting, it was plainly inadequate to support a finding that it was unseaworthy because of the condition of the hook. Accordingly, the judgment in favor of Mosley must be reversed and the case remanded for a new trial.

■ Under legal principles now well established, a ship and its owner are liable to indemnify a seaman for an injury caused by the unseaworthiness of the vessel or its appurtenant appliances and equipment. The Osceola, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760 (1903); Mahnich v. Southern Steamship Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561 (1944). See Note, 76 Harv.L.Rev. 819 (1963). The shipowner's absolute duty to furnish and maintain a seaworthy vessel is owed not only to seamen but also to longshoremen and stevedores employed by someone other than the shipowner who are injured in the course of their employment aboard the vessel while "doing a seaman's work and incurring a seaman's hazards." Seas Shipping Co. v. Sieracki, 328 U.S. 85, 99, 66 S.Ct. 872, 880, 90 L.Ed. 1099 (1946); Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 74 S.

Ct. 202, 98 L.Ed. 143 (1953); Crumady v. Joachim Hendrick Fisser, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413 (1959). Moreover, a shipowner is not relieved of his obligation to provide a seaworthy vessel by the fact that the appurtenant appliances and equipment which are used in the work and cause the injury are supplied by the stevedoring contractor. Alaska Steamship Co. v. Petterson, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798 (1954); Rogers v. United States Lines, 347 U.S. 984, 74 S.Ct. 849, 98 L.Ed. 1120 (1954); Massa v. C. A. Venezuelan Navigacion, 298 F.2d 239 (2 Cir., 1962). But the shipowner's duty to furnish a seaworthy ship is not a duty to furnish an accident-free ship; "it is a duty only to furnish a vessel and appurtenances reasonably fit for their intended use." Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 550, 80 S.Ct. 926, 933, 4 L.Ed.2d 941 (1960). Thus, the concept of the unseaworthiness of a ship is a relative one, dependent for definition in each instance upon the circumstances in which her fitness is drawn into question. It is against these principles that the evidence introduced in the trial court in the present case must be measured.

■ The first of plaintiff's attempts to establish the unseaworthiness of the S.S. Turmoil was based upon his testimony that the 'tween deck to which he was assigned to work was dark or semi-dark because of inadequate illumination. If the jury believed Mosley's testimony, we have no doubt that it could be permitted to conclude that a ship without adequate lighting is not reasonably fit to permit a longshoreman to perform the task of loading cargo with reasonable safety and therefore is unseaworthy. So much was held in Mollica v. Compania Sud-Americana de Vapores, 202 F.2d 25 (2 Cir., 1953) in which this court stated, "It cannot be gainsaid that a ship is unseaworthy for loading if, and when, adequate lights to make the work reasonably safe are lacking in the part of the ship being loaded." Id. at 27. Although that decision rests upon a doctrine of

228

control which is no longer viable, its rationale of the content of the doctrine of unseaworthiness retains its vitality, Grillea v. United States, 232 F.2d 919, 922 (2 Cir., 1956), as subsequent holdings that the absence of adequate lighting can render a ship unseaworthy demonstrate. E. g., Pagano v. United States, 168 F. Supp. 793 (E.D.N.Y.1959); cf. Blankenship v. Ellerman's Wilson Line New York, Inc., 265 F.2d 455 (4 Cir., 1959); Ross v. Steamship Zeeland, 240 F.2d 820 (4 Cir., 1957).

We are less certain, however, as to whether a jury could be permitted to conclude on the evidence presented below that the absence of lighting was the proximate cause of plaintiff's injuries. We recently approved an instruction that proximate cause requires "an unbroken chain of events flowing from the unseaworthiness or negligence and leading to the injury." Blier v. United States Lines Co., 286 F.2d 920, 925 (2 Cir., 1961). In view of Mosley's testimony that he was aware he was standing on scrap and that he knew his footing was insecure, the question of whether such an "unbroken chain" could reasonably be found to have existed between the inadequate lighting and the eventual injury is not free from doubt. But we need not decide that here because, even assuming a jury could be permitted so to find, it could not be permitted to find that the plaintiff had established as an alternate ground of unseaworthiness a defect in the hook.

■ It is true that a shipowner can be held liable for failure to meet this duty to provide a seaworthy ship solely because an appurtenant appliance brought on board by the stevedore is not reasonably fit for its intended use, Alaska Steamship Co. v. Petterson, supra, and that an unsafe cargo hook can be the basis for such a holding. De Van v. Pennsylvania R. R. Co., 167 F.Supp. 336 (E.D.Pa.1958). But the existence of this principle of law does not relieve the plaintiff of his burden of demonstrating by a preponderance of the credible evidence that the appliance or tool which he claims caused his injury was an appurtenance of the ship, cf. Sherbin v. S. G. Embiricos, Ltd., 200 F.Supp. 874 (E.D.La.1962), and that it was not reasonably fit for its intended use. Mosley failed to meet that burden in the present case.

Although he was examined in some detail with respect to the hook, Mosley's testimony does not give an adequate basis for the suggestion, far less the conclusion, that the origin or ownership of the hook could be attributed to either Adra or Lipsett. Mosley was asked on direct examination:

"Q. Do you know where it [the hook] came from? A. No, I do not."

He was asked on cross-examination:

"Q. In other words, it wasn't something that was manufactured and given to you to use on the ship, is that correct? A. That is correctly.

"Q. It was picked up out of the scrap metal and somebody fashioned a hook out of the end, and that is what you used? A. Yes, sir."

His reference to the hook as "my hook" at another point in the examination is not probative, of course, of who gave him the hook, particularly in light of his answers that he did not know where the hook came from, that it was not given to him to use on the ship, and that it was an improvised rather than a manufactured product.

■ Even assuming *arguendo*, however, that the jury reasonably could have found that the hook was an appurtenance of the ship, Mosley failed to put in any proof that the hook was defective, worn, weakened, broken, improperly designed, insufficiently strong, excessively old, or in any other way unfitted or unsuited for its intended use. See Michalic v. Cleveland Tankers, Inc., 364 U.S. 325, 81 S.Ct. 6, 5 L.Ed.2d 20 (1960). The most that Mosley proved was that the hook slipped while being used. But, as we have many

times said, the mere fact that an accident occurs and a seaman is injured while using an appurtenance in the performance of his duties cannot, without more, establish that a vessel is unseaworthy. Nuzzo v. Rederi, A/S Wallenco, Stockholm, Sweden, 304 F.2d 506 (2 Cir., 1962); Puddu v. Royal Netherlands Steamship Co., 303 F.2d 752 (2 Cir., 1962); Ezekiel v. Volusia Steamship Co., 297 F.2d 215 (2 Cir., 1961); Richter v. Mathiasen's Tanker Industries, Inc., 297 F.2d 494 (2 Cir., 1961).

Because of this failure of proof, a jury would not be permitted to base a finding of unseaworthiness solely upon the condition or fitness of the hook. The fact that the jury returned a general verdict leaves fully open the possibility that this is precisely what it did. In these circumstances, we have no choice under the principles of appellate review recited above but to reverse Mosley's judgment against Adra and remand for a new trial.

This disposition of Adra's appeal from the judgment in favor of Mosley makes it unnecessary for us to consider the issues raised by Lipsett's appeal from the judgment for indemnity in favor of Adra or by Adra's additional appeal from the trial court's refusal to amend its indemnity judgment to include an award for counsel fees.

Reversed and remanded.

FRIENDLY, Circuit Judge (concurring).

I am in full accord with my brother MARSHALL that we must reverse for error in the charge with respect to the hook; indeed, as I read the charge, the jury could well have understood it to warrant their finding unseaworthiness on the basis not only of a defect in the hook but also of one in the stow, although at the argument before us plaintiff's counsel conceded that on the facts here the ship was not chargeable for any defect in the last. My doubt is whether plaintiff's evidence as to the lighting sufficed to warrant submission to the jury at all. No one can quarrel with the general proposition that proof of inadequate lighting is enough to support a finding of unseaworthiness. But here plaintiff's expert testified there was "a custom and practice" to have portable lights as part of a ship's equipment and

> "When there was not sufficient light in the lower hold or in the 'tween decks, we had the ship put lights in the corners, so to come cross-wise down in the hold or in the 'tween deck, so the people would see that the stowing would be done properly."

This evidence would seem to demand a further showing that the S.S. Turmoil did not have adequate portable lights at Lipsett's disposal; if she did, I would think that, on plaintiff's own theory, there was nothing to warrant the conclusion that she was unseaworthy. Mollica v. Compania Sud-Americana de Vapores, 207 F.2d 25 (2 Cir., 1953), is still viable to the extent that if a vessel has all necessary appliances available, she is not to be cast for unseaworthiness simply because those doing the work do not use them, whether such person be a stevedore, as here, or a seaman as in Ezekiel v. Volusia S.S. Co., 297 F.2d 215 (2 Cir., 1961), cert. denied, Pinto v. States Marine Corp. of Del., 369 U.S. 843, 82 S.Ct. 874, 7 L.Ed.2d 847 (1962). None of the cases cited by my brother MARSHALL is *contra*. There was no clear evidence that portable lights were not available; the closest plaintiff came to proving this is some testimony that an officer of the vessel made an inspection of the 'tween-deck with a flashlight to see whether any damage to cables was being done. The remand will permit a fuller exploration of these facts and submission of the case to the jury on instructions that will focus attention more precisely on the issue really in dispute, 28 U.S.C. § 2106. Further delay in the disposition of Mosley's claim against the ship is, indeed, unfortunate, but other remedies have been available to him in the meantime.

CLARK, Circuit Judge (dissenting).

Study of the record convinces me that no error prejudicial to the defendants

occurred in the trial and that the plaintiff's verdict and judgment should be affirmed. Indeed, the only question which might give me pause is as to the action of the trial judge in taking the issue of negligence from the jury—a course which suggests a sharper differentiation between the correlative concepts of negligence and unseaworthiness than the modern precedents appear to support. But if there were error here, it was in the defendants' favor and hence gives no basis for reversal on their appeal.

For the rest, Mosley's own testimony (the only evidence bearing on the accident) gave convincing support to the two claims of inadequate lighting and improper appliances—both classic instances of unseaworthiness, as indeed the opinion demonstrates with ample citations. Mosley testified as to the difficulty of seeing the metal wedged in the chute because of the darkness and his inability to dislodge it with the improvised scrap metal hook which was his only tool. That then he slipped while standing on scrap and trying thus unsuccessfully to clear the chute would seem to present an obvious case for the jury to decide. My brothers are hard pressed to find grounds for taking these issues from the jury, and never do make clear the basis for their decision or indeed what further or other evidence they think the plaintiff should have produced. It is now well settled, contrary to earlier views, that a claimant need not produce expert testimony as to the inadequacy of the ship's equipment, but the jury may make obvious deductions from the nature of the accident. Salem v. United States Lines Co., 370 U.S. 31, 82 S.Ct. 1119, 8 L.Ed. 2d 313, reversing a decision of this court, made that quite clear. In the light of the Salem principle I see no basis for ruling as a matter of law either that the appliance was adequate or that proximate cause was lacking. As we have recently held, "[t]he burden of selecting proper tools is not upon the seaman." Street v. Isthmian Lines, 2 Cir., 313 F.2d 35, 38.

Regretfully I must conclude that this is yet another instance where my brothers determinedly deny the benefits of trial by jury to Jones Act plaintiffs. See citations in my dissents in Walters v. Moore-McCormack Lines, 2 Cir., 312 F.2d 893, and Nuzzo v. Rederi, A/S Wallenco, Stockholm, Sweden, 2 Cir., 304 F.2d 506, 511, 514.

I would affirm.