Edward COLANTUONO, Plaintiff,
v.
NORTH GERMAN LLOYD LINE, Defendant.

ORLANDA-REEDEREI G.m.b.H., Defendant and Third-Party Plaintiff,
v.
INTERNATIONAL TERMINAL OPERATING CO., Inc., Third-Party Defendant.

United States District Court
S. D. New York.
April 30, 1963.

Goldstein & Sterenfeld, New York City, for plaintiff; Herbert W. Sterenfeld, New York City, of counsel.

Haight, Gardner, Poor & Havens, New York City, for defendant and third-party plaintiff; William P. Kain, Jr., New York City, of counsel.

Alexander, Ash & Schwartz, New York City for third-party defendant; Joseph Arthur Cohen, New York City, of counsel.

DAWSON, District Judge.

This is an action brought by a longshoreman for injuries received during the course of loading a vessel of the defendant. A pre-trial order was entered on June 21, 1962, in which it was provided, on stipulation of the parties, that the matter would be transferred to the admiralty side of the court, there being no diversity of citizenship. For this reason the action was tried by the Court without a jury.

The pre-trial order also provided, by stipulation of the parties, that "the Court will first try the issue of liability and comparative negligence. If liability is found then a date shall be fixed for a trial of the issue of damages." The issues were also defined in the pre-trial order. There were two issues presented by the plaintiff: (1) that the defendant was negligent, and (2) that the steamship of the defendant was unseaworthy.

A trial was had, testimony taken and the Court now delivers its opinion which will constitute its findings of fact and conclusions of law:

The plaintiff was a longshoreman working for the third-party defendant, International Terminal Operating Co., Inc. International Terminal Operating Co. was retained by the defendant North German Lloyd Line to load the vessel "Bischofstein". The cargo being loaded consisted of copper ingots about four feet long and several inches in diameter which were described as "cigars" since they bore the appearance of large cigars. The copper ingots had been transported to the side of the ship in a lighter. They were lifted by a boom from the lighter over the hatch of the ship and then let down into the hatch of the ship. The issue in the case relates to the method of loading these ingots. Apparently the procedure was for two chains to be used. The chains were wrapped around the respective ends of the ingots while on the lighter, and the chains were then raised by the boom. When the boom lifted up the chains tightened around the ingots. The boom then lowered the draft of ingots into the hold of the ship where the ingots were to be deposited on four by four planks so that a fork-lift truck could lift them up and put them into the part of the ship in which they were finally to be transported. At times when a draft of ingots would come down into the hold the draft would not be centered directly over the four by fours and it was necessary for a longshoreman standing in the hold to push the draft to get it centered directly over the four by fours.

On July 10, 1958, plaintiff, who was employed as a longshoreman by the third-party defendant, was working in the No. 4 hold of the "Bishchofstein". He went to work at about 8:30 in the morning of that day. A number of drafts of ingots, totaling probably thirty, had been delivered to this hold before the accident occurred. It was the duty of the plaintiff and his partner to push the drafts when they arrived near the bottom of the hold so that they would be centered over the four by fours. At about 10 o'clock in the morning a draft of ingots was lowered into the hold. The plaintiff, in order to move the draft slightly so as to center it, took hold of the chain surround-

ing one end of the ingots and pushed the chain. This chain, composed of a number of links, as most chains are, had a hook at the end, which hook was attached around the chain after the chain had been looped up around the ingots. When the plaintiff pushed the chain he grabbed the chain just below the hook and the pressure was such, apparently, that the hook slipped on the chain, came down the chain about nine inches and caught plaintiff's thumb, with the result that plaintiff's thumb was amputated. It was stipulated in the pre-trial order, and agreed at the trial, that the chain sling which the plaintiff was holding did not break or part.

The contention of the plaintiff is that the use of the chain by International Terminal Operating Co. (which admittedly provided the chain) was negligence and that the use of this chain on the ship made the ship unseaworthy. These were the two issues presented to be tried.

Plaintiff urged that the hook could not slide readily up and down the chain, since the links would impede the hook from slipping easily up and down the chain. Plaintiff's counsel, therefore, urged that the proper procedure was to use a wire rope rather than a chain. He presented as his expert a man who had been a longshoreman for many years, who testified that the hook would slide more readily on a wire rope than on a chain. The evidence of defendant was substantial that chains are customarily used for loading operations with copper "cigars", although some longshore companies do use wire rope. There was testimony also, which was uncontradicted, that the chains are more expensive to use than wire ropes and that the use of chains is not an economic measure. There was undisputed testimony that the chains had a tendency to hold the copper "cigars" more securely than wire ropes and therefore would prevent slippage of the cargo when it was being lowered into the hold.

Plaintiff, in effect, has asked the Court to rule that it was negligence and unseaworthiness to use chains to lower copper ingots into the hold of a ship. On this issue the plaintiff had the burden of proof. The Court cannot conclude that the plaintiff has established by a fair preponderance of the evidence that it was negligence to use chains, or that the use of the chains made the ship unseaworthy.

Whether chains, wire ropes or other ropes are used for lowering a cargo, we still have the situation that when the rope or wire is turned around the draft and the end of the chain or wire or rope is hooked around the part of the chain or wire or rope going up to the boom, it will never be completely tight unless the draft is at rest on the deck of the ship. It will reach a point of equilibrium which in effect forms a triangle. Under those circumstances any movement of the chain, or wire or rope will tend to disturb the equilibrium of the hook with the result that the hook will slide up or down the chain or wire or rope. This is inherent in the loading operation. The plaintiff himself recognized that the hook was likely to slide up or down the chain. His partner on this particular job, who also testified (but did not see the actual accident), recognized this fact and said that the longshoremen should never grab the chain under the hook. The plaintiff himself testified that he knew it was dangerous to put his hand under the hook because he realized the hook might slide up or down.

Loading ships is a dangerous occupation. This is inherent in the nature of the business. It is probably for this reason that Congress has provided workmen's compensation for longshoremen, which plaintiff admittedly received in the present instance.

As the United States Supreme Court said in Mitchell v. Trawler Racer, 362 U.S. 539, 550, 80 S.Ct. 926, 933, 4 L. Ed.2d 941 (1960):

"What has been said is not to suggest that the owner is obligated to furnish an accident-free ship. The duty is absolute, but it is a duty only to furnish a vessel and appurtenances reasonably fit for their intended use. The standard is not

perfection, but reasonable fitness \* \* \*."

See also Mosley v. Cia. Mar. Adra, S.A., 314 F.2d 223, 227 (2d Cir. 1963):

"Under legal principles now well established, a ship and its owner are liable to indemnify a seaman for an injury caused by the unseaworthiness of the vessel or its appurtenant appliances and equipment. \* \* Moreover, a shipowner is not relieved of his obligation to provide a seaworthy vessel by the fact that the appurtenant appliances and equipment which are used in the work and cause the injury are supplied by the stevedoring contractor. \* \* \* But the shipowner's duty to furnish a seaworthy ship is not a duty to furnish an accident-free ship \* \* \*. Thus, the concept of the unseaworthiness of a ship is a relative one, dependent for definition in each instance upon the circumstances in which her fitness is drawn into question. \* \* \* "

■ Thus the fact that the accident happened is not sufficient in and of itself to establish that negligence existed or that the ship was unseaworthy. A seaman who put his hand under a hook which was bound around a draft of heavy cargo, with full realization that the hook would slide up or down the chain or rope or wire to which it was attached, cannot say that the use of a chain, in and of itself, was negligence or made the ship unseaworthy. The fact that a chain has links in it, which might at times impede the sliding of the hook, is no different than a wire rope which, as the evidence showed, would get kinks in it, with the same results.

The Court, as the trier of the facts, cannot conclude that plaintiff has established by a fair preponderance of the evidence that the defendant was negligent or the ship was unseaworthy. The unfortunate accident was caused by the failure of the plaintiff to use proper precautions in that he put his hand underneath the hook, so that it slid down on his hand, rather than above the hook, as he knew would have been the safer and proper place to put it.

■ The Court concludes that plaintiff has not established by a fair preponderance of the evidence the issue of either negligence or unseaworthiness. Under those circumstances it is unnecessary to consider the cross-claim of the shipowner against the longshore company or the issue of damages. The action will be dismissed with costs.

This opinion shall constitute the findings of fact and conclusions of law of the Court.

So ordered.