# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT


## 07-653


**DIONE CAGLE**

**VERSUS**

**HARRAH'S LAKE CHARLES, L.L.C. AND/OR**
**PLAYERS LAKE CHARLES, L.L.C.**


**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2002-2169
HONORABLE G. MICHALE CANADAY, PRESIDING
**\*\*\*\*\*\*\*\*\*\***


**SYLVIA R. COOKS**
**JUDGE**


**\*\*\*\*\*\*\*\*\*\***


Court composed of Ulysses Gene Thibodeaux, Chief Judge, Sylvia R. Cooks and
Billy H. Ezell, Judges.


                                                          **AFFIRMED.**

Rex D. Townsley
The Townsley Law Firm
3102 Enterprise Blvd.
Lake Charles, LA 70601
(337) 478-1400
COUNSEL FOR PLAINTIFF/APPELLEE/CROSS-APPELLANT:
    Dione Cagle

J. Mac Morgan
Law Office of J. Mac Morgan
4650 Nelson Road, Suite 415
Lake Charles, LA 70605
(337) 474-7143
COUNSEL FOR PLAINTIFF/APPELLEE/CROSS-APPELLANT:
    Dione Cagle

**James B. Doyle**
**P.O. Box 5241**
**4809 Ihles Road**
**Lake Charles, LA 70606**
**(337) 474-9989**
**COUNSEL FOR DEFENDANTS-APPELLANTS:**
       **Harrah's Lake Charles and/or Players Lake Charles, L.L.C.**

**COOKS, Judge.**

Plaintiff, Dione Cagle, was employed by Harrah's Lake Charles as a slot machine technician aboard the M/V Players III casino riverboat. On November 5, 2000, Ms. Cagle reported to the Player's Security Office that she slipped and fell on the stairs of the third deck of the riverboat. Ms. Cagle filed suit on April 30, 2002, alleging her status as a seaman under the Jones Act, 46 U.S.C. § 688, and asserting claims for negligence and unseaworthiness. The defendants answered the lawsuit, denying that any such accident occurred, and alternatively denying liability. A bench trial was held on June 28-30, 2006.

At trial, Ms. Cagle contended the steps did not have the appropriate non-skid material upon them and were improperly installed, which allowed water to pool up on the steps. She also claimed the lighting on and around the stairs was inadequate, and rendered the riverboat unseaworthy. Testimony at trial indicated the lighting in the stairs area was "dim," although the defendants claimed it was sufficient.

Defendant pointed out that Ms. Cagle did not immediately seek medical treatment, but waited until a few hours after she said she fell. After filling out the accident report, Ms. Cagle drove herself to St. Patrick's Hospital, where she was treated and released. Defendant notes she returned for her next assigned shift and remained in Defendant's employ until she was fired six weeks later for excessive absences.

Defendant stated it conducted an immediate examination of the scene of the incident. Ernest Kickel, who was a security officer, testified he did not find any unreasonably dangerous conditions present at the incident site. He noted the lighting was "dim," but believed it was adequate for him to see the steps. The lighting in the area was reported on Defendant's accident report as "Outside Dim."

After the alleged accident, Ms. Cagle was treated for a number of months by Dr. James Perry with complaints of lower back pain. She was diagnosed with a lumbar strain with mild radicular symptoms and some disc protrusion at the L5/S1 level. Dr. Perry did question whether the objective findings of injury supported the amount of pain complained of by Ms. Cagle. Ms. Cagle received treatment from other physicians over the next few years. Complaining of continued severe pain, an independent medical evaluation was performed by Dr. Clark Gunderson. In his report, Dr. Gunderson found Ms. Cagle to have an "EMG consistent with the disc protrusion with a lumbosacral radiculopathy." Considering that five years had elapsed since the injury and Ms. Cagle still had significant limitation despite years of conservative therapy, Dr. Gunderson was of the belief that Ms. Cagle would require future surgery to alleviate her disc problems.

After a three-day trial, the court rendered judgment in favor of Ms. Cagle, and set forth the following reasons for judgment:

> Based on the evidence, it appears evident that, at the time of the accident at issue in this case, the Player's III was a vessel in navigation for the purposes of the Jones Act. The Court accepts this particularly based on the fact that records show that the Player's III was still making voyages over Lake Charles at the time of the accident in November 2000.
>
> Considering the fact that Player's III was in fact a vessel in navigation, then it is evident that Plaintiff had attained seaman status during her employment with Harrah's and should be able to assert her claim for damages under the Jones Act.
>
> Plaintiff alleges that inadequate lighting on the hurricane deck was a proximate cause of the accident and caused the Player's III to be unseaworthy. Based on the evidence adduced during the trial, particularly the testimony of Mr. Kickel, it is evident that the lighting on the Player's III was not bright enough for the purpose used. Apparently there was only a set of what was referred to as "porch lights" shinning [sic] outside the door that led out to the steps in question. There were no lights near or above the stairs, which according to various accounts, were available for use by patrons and employees for moving between deck levels on the Player's III. Considering that these stairs were

frequently used by both employees and patrons of the casino, during nighttime operations, there should have been lighting that was adequate to ensure that users of the stairs were able to use them safely and easily and to be able to see any hazards which could have existed on the stairs. The stairs were not adequately lit and this was a proximate cause of the accident which occurred. In ruling the vessel unseaworthy due to the lighting allegations, the Court sees no need to proceed to evaluate the steps' "non-skid" protection or the failure of the defendants to hold safety meetings. The Court, now establishing liability, moves to discuss causation and damages.

In a Jones Act case, where the vessel is considered unseaworthy, it must be shown that the unseaworthy condition played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness. In this case, the Court finds that the lack of lighting on the stairs in question played a substantial part in bring [sic] about the fall of the plaintiff while she was descending the stairs. As a result of this fall, the plaintiff did in fact sustain injuries.

The level of injury sustained and the amount of damages are not abundantly clear from the evidence and testimony presented. While Dr. Raggio and Dr. Perry seem to have some doubt about the severity of the injuries sustained by plaintiff, the I.M.E. performed by Dr. Gunderson found otherwise. The I.M.E. states that the primary complaints are lower back and right leg pain. The I.M.E. also states that the plaintiff has an EMG consistent with disc protrusion with a lumbosacral radiculopathy. As a result, the Court finds that the plaintiff has suffered damages as a result of her fall while at work and is entitled to an award of damages from the Defendant, Harrah's. The testimony of the IME doctor confirmed injury and was uncontested on medical probability of future surgery. The Court does not find that Plaintiff has reached the point of maximum medical improvement, and thus should be entitled to awards of maintenance and cure from the date of the accident, less any credits for amounts previously paid. Evidence indicates that the Defendant paid most of the accident related medicals, but at no time paid any maintenance to the Plaintiff. Therefore, the Court does find that Defendant has acted in a way, in not paying maintenance and cure which could be described as "callous and recalcitrant or arbitrary and capricious." A finding of this sort is necessary for a statutory award of attorney fee's, which the Court finds is present in this case.

The trial court awarded damages in the following amounts: $150,000 in General Damages; $143,722 in Past Loss of Earnings; $331,677.87 in Future Loss of Earnings; $80,000 in Future Medicals; $9,287 in Past Medicals; and $30,885 in Past Maintenance. The trial court found, while Defendant did pay most of the medical

bills, it paid no maintenance and cure to Ms. Cagle. The trial court then concluded that the Defendant's failure to pay maintenance and cure was arbitrary and capricious and awarded Ms. Cagle $10,043.14 in Attorney Fees. The trial court also ordered Defendant to pay "legal interest on all past losses from the date of the injury (November 5, 2000) until paid in full."

Defendant has appealed the judgment and argues the trial court erred in its finding of unseaworthiness. It also argues the trial court committed manifest error by accepting the testimony of Ms. Cagle in the face of "greatly preponderant objective evidence" to the contrary. Defendant further assigns as error, in the alternative, that the trial court erred in failing to find Ms. Cagle comparatively negligent. Lastly, Defendant contends the trial court awarded excessive damages, should not have awarded attorney fees and erred in awarding prejudgment interest. Ms. Cagle answered Defendant's appeal and argues the amount of damages awarded was inadequate and requests an increase in the award.

**ANALYSIS**

Appellate courts in Louisiana apply the manifest error standard of review in Jones Act cases. *Milstead v. Diamond M Offshore, Inc.*, 95-2446 (La. 7/2/96), 676 So.2d 89; *Richard v. Mike Hooks, Inc.*, 99-1631, 99-1632, 99-1633 (La.App. 3 Cir. 10/4/00), 772 So.2d 148, *reversed on other grounds*, 01-145 (La.10/16/01), 799 So.2d 462. A reviewing court must review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous. *Butler v. Zapata Haynie Corp.*, 92-71, p. 7 (La.App. 3 Cir. 2/23/94), 633 So.2d 1274, *writ granted in part and denied in part*, 94-1171 (La.7/5/94), 639 So.2d 1186, *cert. denied*, 513 U.S. 1017, 115 S.Ct. 579, 130 L.Ed.2d 494 (1994). To reverse the determinations of the trial court, an appellate court must (1) find from the record that a reasonable factual

basis does not exist for the finding of the trial court, and (2) determine that the record establishes that the finding is clearly wrong or manifestly erroneous. *Stobart v. State, Through DOTD*, 617 So.2d 880 (La.1993).

### I.    *Credibility Determination as to Ms. Cagle.*

Defendant initially argues the trial court committed manifest error by accepting the testimony of Ms. Cagle in the face of "greatly preponderant objective evidence" to the contrary. Defendant argues the documents and evidence so contradicted Ms. Cagle's story, we should find the trial court manifestly erred in accepting her version of the events. Defendant listed several examples of testimony adduced at trial that it believed contradicted Ms. Cagle's version of events, including the fact she was outfitted with a radio at the time she allegedly fell, but did not call for assistance. However, Ms. Cagle acknowledged freely at trial that she had her radio but did not call for assistance. She stated after the fall she took the elevator down to the break room to sit. It was later, when she realized she may have been significantly injured that she went to the security office to report the fall. Defendant also points to Ms. Cagle's admission that "she could have avoided walking through dim light down three flights of wet steps in the rain and fog simply by simply taking the elevator inside the casino." Ms. Cagle testified she chose to use the steps because on the day of the accident, which was on a weekend, the boat was extremely crowded, and using the elevator would have taken "forever" and she would "have missed most of [her] lunch." Defendant also notes at length that Ms. Cagle apparently did not like her job and had applied for other work prior to the date of the incident. Ms. Cagle freely acknowledged this was true during her testimony , however the trial court obviously found this admission was not sufficient to cast serious doubt upon Ms. Cagle's credibility or version of the events. The trial court's decision to accept her "story,"

as opposed to Defendant's theory that the accident did not happen was not manifestly erroneous.

Defendant also argues the medical testimony and records contradicted Ms. Cagle's testimony as to the severity of the injuries she suffered in the accident. It argues Dr. Raggio's examination revealed numerous instances of "non-physiological findings," which led him to the conclusion that she was magnifying her symptoms. However, even though Dr. Raggio testified he believed Ms. Cagle was exaggerating her symptoms, he still recommended that she see a pain management specialist.

Defendant also contends "the testimony of Dr. Ramos, whom Ms. Cagle saw after her reported accident while she was still working at Harrah's, . . . contains evidence of Ms. Cagle sustaining additional injury, and is inconsistent with their testimony." Defendant does not elaborate any further on this contention. The record reveals Ms. Cagle was treated by Dr. Ramos in July 2000 for a wrist sprain superimposed over an old wrist fracture. Dr. Ramos again saw Ms. Cagle in December of 2000 for flu-like complaints, and noted in his chart that she had re-injured her right hand. We find nothing in Dr. Ramos' testimony which in any way calls into question Ms. Cagle's testimony. We note the injuries which Ms. Cagle alleges she sustained in the fall were to her back and not her wrist.

The trial court in its written reasons noted there was "some doubt about the severity of the injuries sustained by plaintiff," but believed the independent medical examination performed by Dr. Gunderson substantiated Ms. Cagle's complaints. Therefore, we find no merit in Defendant's argument that the documents and evidence presented at trial contradicted Ms. Cagle's story.

## II.    *Unseaworthiness.*

Defendant notes that the trial court determined that the stairs in question were

-6-

not "adequately lit" and that this rendered the vessel unseaworthy as a matter of law. Defendant argues this was error, "primarily because there was absolutely no factual support for any finding that the lighting affected Ms. Cagle's walk down the outside stairs." We disagree.

The trial court relied on the testimony of Ernest Nickel, who was Harrah's security officer who investigated the accident on the night it occurred and then prepared the accident report. Mr. Kickel testified as follows in response to questions concerning the conditions of the stairs:

> Q. When you have opened the double doors and are walking across the deck that you described, how far is it to get to the steps that you later looked at in your investigation?
>
> A. To the best of my recollection, it's 10' to 12'.
>
> Q. This was at night, wasn't it?
>
> A. Yes, sir.
>
> Q. How is that area illuminated?
>
> A. On either side of the door, there are – I call them porch-type lights, hanging lights with basically a light bulb on the inside.
>
> Q. And these are over by the double doors?
>
> A. By the doors themselves, yes, sir.
>
> . . . .
>
> Q. Now, next there is a blank, or there is a section over here called "lighting condition." Do you see that?
>
> A. Yes, sir.
>
> Q. And would you explain what you've checked and why you checked it the way you did and why you wrote in there what you wrote?
>
> A. Okay. I wrote in there "outside dim." In other words, there were outside lights but the area was dimly lit.

Mr. Kickel also noted that in addition to the lighting on the third deck being dim,

there were "no stairwall lights whatsoever."

Ms. Cagle's testimony corroborated the inadequate lighting conditions surrounding the stairs in question:

> Q.      What were the lighting conditions like as you entered the stairwell?
>
> A.    Poor.  In the stairwell they were nonexistent.  Coming out of the door it was dim.
>
> . . . .
>
> Q.    When you got up to go could you see the water on the steps?
>
> A.    No.
>
> Q.    And why not?
>
> A.    Because it was dark.

With the uncontradicted testimony that the lighting in the stairs area was dim, we find no error on the trial court's part in ruling that the vessel was unseaworthy due to inadequate lighting.  As pointed out by Ms. Cagle, the concurring opinion in *Mosley v. Cia. Mar. Adra., S.A.*, 314 F.2d 223, 229 (2 Cir 1963), *cert. denied*, 375 U.S. 835, 84 S.Ct. 52 (1963), stated that there is a "general proposition that proof of inadequate lighting is enough to support a finding of unseaworthiness."

We also find without merit, Defendant's contention that Ms. Cagle failed to establish the proximate cause prong of liability for unseaworthiness.  There was ample testimony, as well as corroborating evidence in the form of the accident report, that Ms. Cagle's fall was caused by inadequate lighting.  Ms. Cagle also presented the testimony of Captain Joseph Ahlstrom, who was accepted as an expert in vessel operations and marine safety.  Captain Ahlstrom inspected the boat and reviewed its shipyard drawings, and concluded the inadequate lighting was a substantial factor in causing Ms. Cagle's slip and fall, and as such rendered the vessel unseaworthy.

### III. *Comparative Fault.*

Defendant contends the trial court erred in not assessing any comparative fault to Ms. Cagle. It argues Ms. Cagle "slipped and fell on stairs made wet by rain, a condition which was obvious to her." We disagree with Defendant's assertion that any moisture on the stairs should have been "obvious" to Ms. Cagle. She testified due to the inadequate and non-existent lighting, she was unable to see the water on the stairs. Defendant's also asserts that "Ms. Cagle's actions in traversing a stairway, at night during her regular shift, were routine." Defendant asserts this task was not particularly dangerous and was routinely accomplished without injury by those in her position. However, this assertion ignores the fact that the stairway was not properly lit. Traversing wet stairs in lighting that is deficient to the degree it renders the vessel unseaworthy is not routine.

Defendant also argues Ms. Cagle had "a readily available, safe alternative method" available to her, specifically the inside stairs or elevator, but failed to use that method. Ms. Cagle explained why she chose not to use the inside stairs or elevator. She stated at the time of the incident she was heading ashore to go to the lunch room. The date in question was on a weekend, and she testified the boat was extremely crowded and she would have been forced to use nearly all of her break time trying to descend from the top of the boat, down three levels and through the main casino floor to the ship's general exit on that date. Thus, she did not feel the inside stairs or elevator were a viable option at that time. The trial court apparently accepted this explanation, and concluded her actions were reasonable. Again, we cannot say the trial court manifestly erred in failing to assess any comparative fault to Ms. Cagle.

### IV. *Damages.*

Defendant contends the amounts awarded for past loss of earnings ($143,722)

and future loss of earnings ($331,677.87) were a "clear abuse of discretion." Ms. Cagle answered the Defendant's appeal and asserted the trial court erred when it reduced her future wage loss with an annual minimum wage offset.

Defendant argues it was uncontested that Ms. Cagle continued to work for Harrah's after her accident until she was fired , then obtained other employment and worked there until she was laid off. Defendant contends Ms. Cagle became "voluntarily unemployed," and as such there is no basis for an award for past loss of earnings.

Ms. Cagle testified, although she continued in her job at Harrah's after the accident, she relied on her co-workers to perform any heavy work and only performed light-duty work. Ms. Cagle also stated because Harrah's refused to pay maintenance, she was forced to take a job at H.B. Zachary for approximately one month until March 7, 2001. Further, the independent medical examiner, Dr. Gunderson testified he classified Ms. Cagle as totally disabled from May 7, 2001 until the date of trial. He also stated as of the date of trial, Ms. Cagle had yet to reach maximum medical improvement. Finally, Dr. Rice, who was Ms. Cagle's economist stated he deducted Ms. Cagle's post-accident earnings from his past wage loss calculations. Therefore, we find no error in the trial court's award of past loss wages.

Defendant also argues the trial court erred in its award of future lost wages, because Ms. Cagle had "many reasons not to work at all," including that she was married, had a baby, and her husband received a substantial personal injury settlement. We find no merit in Defendant's argument that because Ms. Cagle is a wife and mother she should not be a member of the workforce. Dr. Rice specifically testified that the "female workplace is in fact progressing and changing." In today's economic climate there are many working mothers in the workforce, most by

necessity and some by choice. Further, there is nothing in the record to suggest Ms. Cagle had no intention of returning to work if she were physically able. Accordingly, there is no support for Defendant's "barefoot and pregnant" argument.

We find the record supports the trial court's future lost wages award. The trial court noted it accepted the uncontradicted testimony of Dr. Rice in reaching the figures at which he arrived. We, therefore, affirm the trial court's future lost wages award.

Defendant also argues it was not required to pay maintenance and cure because Dr. Perry testified Ms. Cagle had reached maximum medical improvement. Maintenance and cure is an obligation imposed upon a shipowner to provide the cost of medical treatment and basic living expenses to a seaman who becomes ill or injured during his service to the ship. *Silmon v. Can Do II, Inc.*, 89 F.3d 240 (5th Cir.1996). Entitlement to maintenance and cure is not based on negligence or unseaworthiness. Rather, it is akin to a workers' compensation benefit, for seamen. It is an obligation of the shipowner, irrespective of fault, that is imposed by the law itself as one annexed to the seaman's employment. *Vaughan v. Atkinson*, 369 U.S. 527, 82 S.Ct. 997 (1962). Its limited purpose is to make the seaman whole, and it does not extend beyond the seaman's need; it ends absolutely at the point that maximum medical recovery has been reached. *Id.* The remedy is essentially curative in nature and is not intended as compensation for injury. *Boudreau v. S/V SHERE KHAN C, in rem*, 27 F.Supp.2d 72 (D.Maine 1998); *Muhammad v. Diamond Offshore Co.*, 02-172 (La.App. 3 Cir. 7/10/02), 822 So.2d 869, *writ denied*, 02-2409 (La. 11/27/02), 831 So.2d 279, *cert. denied*, 538 U.S. 1056, 123 S.Ct. 2215 (2003).

Although Dr. Perry stated he believed Ms. Cagle had reached maximum medical improvement, there were numerous other medical opinions that did not agree

with that assessment. Dr. Lopez's office notes, dated March 6, 2002 and March 25, 2002, which were sent to Defendant with the demand for maintenance, stated that Ms. Cagle had not reached maximum medical improvement. Dr. Gunderson's IME report also set forth that Ms. Cagle was not at maximum medical improvement. The trial court specifically found there was a medical probability of future surgery and that Ms. Cagle had not reached the point of maximum medical improvement. Thus, the trial court found she was entitled to maintenance and cure from the date of the accident. Where there are ambiguities or doubts as to a seaman's right to receive maintenance and cure, they are resolved in favor of the seaman. *Vaughan*, 369 U.S. 527, 82 S.Ct. 997. The trial court did not err in awarding Ms. Cagle maintenance.

Defendant also argues it should not have been assessed with penalties and attorney fees for the failure to provide maintenance and cure because the "medical picture was cloudy." We disagree. It is well established in maritime law that any ambiguities and doubts are to be resolved in favor of the payment of maintenance and cure. *Vaughn*, supra; *Warren v. United* States, 340 U.S. 523, 71 S.Ct. 432 (1951). We find no error in the trial court's conclusion that Defendant's actions in failing to pay maintenance was "callous and recalcitrant or arbitrary and capricious."

## V. *Minimum Wage Offset.*

Ms. Cagle answered Defendant's appeal, and contends the trial court erred in its award of future wage loss by reducing it with an annual minimum wage offset. Ms. Cagle contends the evidence did not support the minimum wage offset, and specifically argues Jeffrey Peterson, the only vocational rehab specialist who testified, did not believe she would ever return to work. Our review of the record indicates Mr. Peterson's testimony was equivocal on whether Ms. Cagle could possibly return to minimum wage work. When asked whether "Ms. Cagle may be able to do some

minimum wage jobs in the future," Mr. Peterson replied "[i]t's possible, yes." Mr.

Peterson, in responding to a question asking what his appreciation of Ms. Cagle's

future earning capacity was, stated:

> Because of the limitations set forth, first of all, in the functional capacity
> evaluation, which was established in the year 2000, and in consideration
> of what Dr. Gunderson testified to yesterday, based on his analysis
> which was done four years later, you're looking at a *wage earning
> capacity that is at least minimum wage of $5.15 per hour*, maybe a little
> bit more than that depending on the job market at the time, but minimum
> wage jobs up to $6.00 at best.

Contrary to Ms. Cagle's assertions, we find evidence in the record which supports the

trial court's decision to apply a minimum wage offset.

## VI.    *Prejudgment Interest.*

Defendant contends the trial court erred in awarding prejudgment interest on

the awards for appellee's past losses. It argues since this case was tried "at law" in

state court, no prejudgment interest is allowable. Defendant notes the seminal case

on this issue is *Milstead v. Diamond M Offshore, Inc.*, 95-2446 (La.7/2/96), 676

So.2d 89. In *Milstead*, the Louisiana Supreme Court addressed the appropriateness

of awarding prejudgment interest:

> An award of prejudgment interest in state maritime cases is
> substantive in nature such that federal law controls.
>
> Under federal law, a plaintiff's entitlement to prejudgment interest
> in a maritime case depends upon the nature of his claim, particularly the
> basis from which the federal court derives its subject matter jurisdiction.
> Federal courts derive their maritime jurisdiction from either the
> constitutional and statutory grant of such power, referred to as
> "admiralty jurisdiction," or from conventional sources such as diversity
> or federal question.
>
> If the court's jurisdiction is based solely upon conventional
> sources, such as federal question, the court applies federal law with
> respect to awarding interest. Since the statute governing the payment of
> interest in civil cases in federal courts, 28 U.S.C. § 1961, provides that
> interest shall be calculated from the date of entry of the judgment,
> prejudgment interest is generally prohibited in such maritime cases. As

such, the courts have consistently refused to grant prejudgment interest on awards recovered under the Jones Act.

Nonetheless, there is an exception to this general rule. Even if the court hears a suit based solely upon federal question, it can sit in "admiralty" if the case is tried before a judge and not a jury. Thus, when an action is based strictly upon the Jones Act, prejudgment interest may be recovered as long as the case is tried to the court and the court exercises its admiralty jurisdiction.

Likewise, where the court's power to hear a case arises from its admiralty jurisdiction, such as a general maritime action for unseaworthiness, the applicable substantive law is federal maritime law, which gives courts the discretion to award prejudgment interest.

In sum, federal courts have the discretion to award prejudgment interest on causes of action based upon their admiralty jurisdiction. However, courts have clearly chosen not to grant prejudgment interest on awards for future losses, including future earnings and future pain and suffering. The rationale underlying this rule being that "recovery of interest on losses not yet incurred effectively grants the recipient double recovery."

676 So.2d at 96-97 (citations omitted).

The *Milstead* decision clearly provided that a state court has the discretion in a *judge tried* Jones Act case to award prejudgment interest on past losses. Therefore, we find no error on the trial court's part in awarding prejudgment interest for Ms. Cagle's past losses.

## DECREE

For the foregoing reasons, the judgment of the trial court is affirmed. All costs of this appeal are assessed to Defendant-Appellant.

**AFFIRMED.**