Michael VENTRONE, Libellant,

v.

UNITED STATES of America,
Respondent,

Pittston Stevedoring Corporation,
Respondent-Impleaded.

No. A. 19296.

United States District Court
E. D. New York.

Sept. 20, 1955.

Samuel P. Fensterstock, New York City, for libellant, Jacob Rassner, New York City, of counsel.

Leonard P. Moore, U. S. Atty. for the Eastern Dist. of New York, Brooklyn, N. Y., Howard F. Fanning, New York City, of counsel, for respondent.

Purdy, Lamb & Catoggio, New York City, for respondent-impleaded, Edmund F. Lamb, New York City, of counsel.

BYERS, District Judge.

The libellant was injured on January 3, 1949 while working as a stevedore's employee on the U. S. A. T. Private John F. Thorson, then docked at Staten Island Pier 13. The cause was brought against the United States as owner of the ship, and the stevedore to be called Pittston, was impleaded in order to invoke possible liability upon its part on the theory of indemnity.

The question for decision is a narrow purely factual one, as to whether the force which set in motion the chain of events involved, can be traced to inattention on the part of the libellant's fellow workmen, or to a defect in the ship's equipment, namely a certain pin which will be described, the office of which was to latch into vertical position a pontoon or section of the hatch covering of number 3 hatch.

The pontoon had been raised by means of a steel cable or fall, and by reason of its not having been made secure, it fell, striking the cable gear whereby part of the latter lashed or snapped in a fore and aft motion, striking the libellant on his face and about his head causing the injuries for which he seeks to recover damages.

It is necessary to discover from the evidence, if that be possible, the true origin of the misadventure.

The libellant was acting as a winchman operating one of the two forward winches at this hatch on the main deck. The accident occurred at about 1:03 p. m. on a clear day.

No fault of the winch is involved.

The steel hatch covering consisted of two sections or pontoons, and it was the forward one weighing about two tons, with which we are concerned. It measured 7½ feet fore and aft, and 20 feet athwartships. At its forward edge it was hinged to the 'tween deck and could thus swing into vertical position, if the aft end was raised.

There was a shackle at the aft end of the pontoon, to which a wire pendant 5⁄8″ in diameter was attached. This pendant led forward to a block at the top of a stanchion; thence aft through another block welded to the underneath side of the coaming at the main deck level.

On the aft end of the pontoon there was an eye splice in the pendant to which a shackle was attached.

In vertical position, the pontoon at the then top, rested against a stanchion attached to which was the latching device intended to maintain the pontoon firmly in place, namely:

(a) A horizontal steel dog 13″–14″ long, 1″ thick weighing about 13 pounds. This pivoted on the bolt that held it to the stanchion, at a height of some 5–5½ feet above the level of the 'tween deck.

This dog was nose shaped, and fitted into an aperture in a slot cut into the then upper surface of the pontoon, and thus engaged the pontoon, i. e., about 2 inches of the dog supported the under side of the said upper and slotted plate of the pontoon.

In this position the dog was vertical.

(b) A metal bracket of ½″ steel alongside the dog was welded into the stanchion. There was a space between the dog and the bracket.

There were means to hold in engagement the dog (in vertical position) with the bracket, namely, holes which were in register in the dog and the bracket, into which a steel toggle pin, 8″ long and ⅝″ to ¾″ in diameter was inserted. Those holes were 13/16″ in diameter.

The thrust of the pin was horizontal, so that when it was properly inserted in these holes, the toggle end of the pin, of from 1″ to 1½″ in length, fell into a right angle relation to the rest of the pin; thus these two related parts of the pin were now in the shape of an "L", the longer dimension being horizontal.

The toggle end was itself controlled by a pin which admitted the dropping of the short end in only the down direction, to form the "L".

The toggle pin was attached by a substantial chain to the dog, which in turn was welded to the stanchion; thus it was in the nature of a fixed element of the latching device, as were the dog and the bracket.

When the pontoon was in the vertical position, those working on the main deck forward of the hatch could not see the latching mechanism which was below and aft, as they looked toward the stern of the ship, or into the hold of hatch No. 3.

Since the pontoon had just been raised at the time involved, it will be realized that cargo had not yet begun to move into the forward end of this hatch. The ship was down by the stern by nearly 11 feet, which means that the inclination aft of the top of the pontoon would exert a pressure against the dog which would not be present if the ship were more nearly on an even keel; that would tend to hold the pontoon in its vertical position, thus lending additional capacity to the latching function of the dog, even if the pin were not in place.

The raising of the pontoon was accomplished in this wise: The shackle at the aft end of the pontoon was attached to the said cable or pendant, which received the hook made fast to it; the winch then raised the cable, which brought the pontoon into vertical position in arcuate motion, until it rested against the stanchion.

So much is not in dispute, nor that the pontoon being upright, fell aft in about 40 to 60 seconds and down; this caused the cable or pendant (about 15 feet long) so to swing or lash as to result in the injury to libellant which has been described.

The reason why the pontoon fell is the matter in controversy.

Libellant was operating his winch on the main deck, one deck above the 'tween from which the pontoon had been raised. In that position the then top of the pontoon was two or three feet below the level of the main deck.

Ventrone's story is (having raised the pontoon to the vertical position by operating his winch):

"Then, the first thing you know, somebody told me to come back. (Release the cable.) They had the dog in, you know, tight and everything. I come down and took off the hook (released the cable). I raised

the hook up (the engaging hook to cable). In about 30 seconds, the pontoon come down and the pendant hit me right on the side of the face."

Thus he did not attempt to testify concerning the cause of the fall of the pontoon, for the reason that he did not see, and probably could not, just what took place when the latching mechanism was supposed to be set. That was done from the 'tween deck.

As to that, we turn to the testimony of Slimas who said that he was the longshoreman who handled the securing of the pontoon.

He said he was back of the stanchion ready to secure the pontoon.

"As the pontoon arised upright, and everything looks secure, the dog fell into the hole. (The slot in the then upper edge of the pontoon.) As I picked up the pin I pushed the pin into the hole and it felt kind of loose, but we had many pins like that before, and worse yet. It was kind of loose, and all of a sudden *I turned away for a minute,* and the pontoon came down". (Italics supplied.)

The witness marked on the photograph (Exhibit C) of the dog and bracket, the place where the pin "was loose." Seemingly he indicated the toggle end of the pin which was intended to fall into right angle relation with the main body of the pin itself.

Further: "The pin—I had to push it in because it was slightly bent. It was a *brass* pin. (Emphasis supplied.)

\* \* \* \* \* \*

"The dog—like I explained before, the dog fell into the hole. \* \* \* As I put the pin into the hole it was secure \* \* \*. That was supposed to be all right." ·

Then as to what next happened:

"The vibration or so must have caused the pin to jump out of the hole \* \* \* *I saw the pin jump out through the hole and the pontoon came down."* (Emphasis supplied.)

He testified above that he had *turned away!* ·

On cross for respondent he repeated that the pin was loose, but he had to give it a little push to insert it in latching position because it was bent. That his job was finished when he placed the pin as stated.

The trial was adjourned at the close of Friday, May 13th, until Tuesday, May 17th, at the request of libellant's counsel, when the cross-examination was resumed. He then for the first time stated that he was not the only one whose job it was to secure the pontoon, but also Marro to whom the witness said he showed the pin, although he —Slimas—put it in place. That he did not put the dog in place because "The dog falls in by itself."

As to this perhaps unimportant matter, the testimony is not understood. There is no spring apparently in the dog, and why it automatically engages the slot does not appear, once the dog and bracket are in operational relation. It would seem that the dog would have to get into the slot by manual adjustment, but perhaps this is a mistaken impression. If it is correct however, Slimas would have been the one to attend to it.

Resuming the narrative of the witness, he said that Marro was "just standing with me." No reason appears why Slimas needed either a helper or observer.

The latter then said to Marro, "It was all right to come back" i. e., "the winch to come back on the pontoon, to haul—he has to slack off."

Marro "repeated it up to the deck \* \* \* to the fellows up on the gangway", i. e., "he hollered."

The witness did not see the striking of Ventrone, because Slimas "was down the 'tween deck when all this happened." He went to the main deck and later returned to the 'tween deck after 15 or 20 minutes and observed the fallen pontoon in flat position; that he took no part in raising it for a resumption of operations.

On this delayed cross-examination he sought to change his testimony on direct,

with respect to the toggle end of the pin when the latter was inserted into the holes:

At page 146 of the record he was asked:

"Q. What did you do with the safety? A. It come down."

Page 147:

"Q. Did it fall down on this occasion? A. I don't recall, sir."

The foregoing was on direct. Cross-examination began at once, and at page 151 he had the opportunity to explain about the condition of the pin after it was in place, i. e., his doubt as to the position of the toggle end.

On the following Tuesday, he was sure that the toggle end did not fall into the "L" shape which he had described on direct.

Whatever the cause may have been, the change in testimony and the witness' entire demeanor did not make a convincing impression on the court.

Further, Slimas said that he "pushed" the pin through the two holes, although the pin was loose. That having done so, he could see that the toggle end had not fallen into position, and yet he told Marro that it was all right "to come back."

That the toggle end could not fall, as he says he had observed; that his reason for telling Marro what he did was "once we have the pin in, sir, we always worked that way."

Then finally, he said that the pin being in the hole he and Marro tried to knock the toggle end down with their hands, before Slimas told Marro it was all right to go ahead.

Thus: "The pin was in the hole, and we told him to come back. To my best knowledge, it was safe enough to work, which happened many times before. We worked on ships before sir, like that."

He says that he did not see what happened to the pin, nor did he see it fall out. That he did not recall whether he saw the dog jump out of its engagement in the slot of the pontoon.

On redirect he said the toggle end of the pin did not fall down because the pin was rusty and dirty, in spite of having twice said the pin was brass, and fitted loosely into the holes.

The upshot of Slimas' testimony is that he did his job improperly, for if the toggle end of the pin did not fall as it should, it was not equal to its task of holding the dog securely latched, and he should have not used it at all, or have caused the order to be relayed to "come back" (meaning to cause Ventrone to slacken away the cable or fall) when he knew he should not do so; or the pin was not in latching engagement at all, and in which case no such signal should have been made for Ventrone's instruction.

If the court observed his demeanor correctly, he knew he was in an embarrassing posture, and tried to make the best of an obviously uncomfortable situation for him.

The other fact witnesses for libellant were of little assistance to his cause.

Marro was with Slimas, and said it was the latter who handled the pin exclusively. He said he observed the pin before Slimas used it, and it was "laying on the deck" not attached to any chain as it was supposed to be. That Slimas picked it up and "put the pin into the groove."

That was an entirely new suggestion, and if it were true, of course Slimas would have himself mentioned the subject. The Marro testimony to that effect is not accepted.

He did say that both of these men tried unsuccessfully to knock the toggle end down once the pin had been inserted into the holes intended to receive it.

If that is true, it accentuates the ultimate use of a pin not in proper condition.

Incidentally his statement to an investigator contained no reference to the toggle end of the pin's being rusty and immovable.

Terzo was the hatch boss who told Ventrone to slack off, because one of the men on the 'tween deck so signaled to him.

The novel element he sought to introduce into the situation was the alleged supply of a new pin to use in the latching process, when this pontoon was raised again within 15 minutes after the accident. Incidentally, he had not mentioned that when giving a statement to an investigator on October 18, 1949.

He testified to the alleged fact that one of the men got "a new pin from the mate," and repeated the statement more than once.

His testimony about there being a new pin in the dog when he inspected the pontoon in its raised position after the accident was unqualifiedly denied by the mate Reddel, and since it is necessary to make a choice between the testimony of these witnesses on that subject, that of the latter is accepted, and of the former is rejected. This selection is based upon what the court observed of the two witnesses on the stand, and a reading of the said statement made by Terzo.

Reddel was called by both sides, his principal testimony being given in the Government's case. His familiarity with the latching mechanism was clearly expounded, his responsibility for its being kept in operable condition was frankly avowed, and his inspection of it a week before the accident, the last prior occasion on which this pontoon had been raised, and the then good condition of all elements, was convincing.

He heard the commotion following this accident and made his way to the main deck at No. 3 hatch promptly, and sent for the ambulance to take Ventrone to the hospital.

He then at an interval of 15 minutes after the accident, went to the 'tween deck to determine why the pontoon fell and to check the equipment, i. e., all elements involved in raising and latching. He found the toggle pin hanging by the chain attached to the dog.

The pontoon had not then been raised, and he remained in the 'tween deck until that had been accomplished. He said as to that,

"Well, I was right close to the stanchion when it was hoisted and saw the fall, or the dog, *put in* and the pin inserted, and that was done" (Italics supplied).

He said that the toggle end of the pin was put down, but did not recall whether it was put down by hand, or fell down.

Then the loading operation commenced, and proceeded for several days.

His opinion being asked, he stated it to be that if the pin were once inserted according to the testimony of Slimas on direct, it would not have jumped out of engagement, even without the toggle down.

His testimony was in accord with a statement in evidence, which he gave to an investigator on November 15, 1949.

This witness is a first officer in the Army Transport Service and has been a government employee since 1942, and has held a Master's license since 1950.

He was in all respects a credible witness, not only for what he observed, but for frankly pointing out what he could not testify to in the factual sense. His testimony is accepted and relied on by the court.

The contrast between him and libellant's witnesses was stated by the latter's proctor in another connection to be alluded to, in this form:

"If I had had all the facts as to the manner of the happening of this accident which might or *might not be in accord with that which I learned from the witnesses,* several of which were far from satisfactory in giving me the cause of this accident, I would have been in a position to properly safeguard the Libellant's right. * * * it is my humble opinion that the Libellant has been caused to suffer and choose a position predicated upon the testimony of men who were far from brilliant, and I question whether they were intelligent * * * And then we would have had a res ipsa loquitur case" (Italics supplied).

The foregoing remarks were addressed to a motion to strike the respondent's answer, for failure to comply with a notice to take depositions, served June 19, 1953.

No effort was made by libellant to secure relief by serving a subpoena pursuant to Rule 45 of the Federal Rules, 28 U.S.C.A., or otherwise to take advantage of the discovery procedures sanctioned by the Rules. The motion was not made until the trial opened.

The affidavits on the subject, pro and con, which were filed after decision was reserved, have been examined to aid the court in that connection. It has not been shown that the deposition of the Master of the Thorson or the boatswain Casey, would have been of any assistance to the libellant. Indeed the affidavit of the latter is quite negative. These three affidavits may be handed up for the information of a reviewing court, if it is willing to receive them.

The motion to strike the Answer of the respondent is denied.

I could wish that it were possible to offer a probable explanation for the unfortunate accident to the libellant, but the testimony does not admit of the formulation of an opinion on the subject.

The impression gained at the trial has been fortified by a careful review of the record and exhibits, that the failure was the result of human error, not negligence or unseaworthiness on the part of the ship.

I doubt if the pin was bent, or otherwise deficient, or Slimas would have made clear on direct the respects in which, as later alleged, it could not perform its function.

Since the ship carried spare pins, for replacement of an unsuitable one, the argument for unseaworthiness disappears, even if this one was inoperable which I do not think the testimony establishes.

There must have been inattention to the proper latching of this pontoon, or it would not have fallen, and there the cause must be left.

Libel dismissed on the merits, for failure of proof. Since this is the disposition, it follows that the impleading petition must also be dismissed. Settle decree.

Findings are filed herewith.