**Joseph SKIBINSKI, Plaintiff,**

v.

**WATERMAN STEAMSHIP CORPORATION, Defendant and Third-Party Plaintiff,**

v.

**INTERNATIONAL TERMINAL OPERATING CO., Inc., Third-Party Defendant.**

United States District Court
S. D. New York.

June 4, 1965.

292

William A. Blank, Brooklyn, N. Y., for plaintiff.

Burlingham, Hupper & Kennedy, New York City, for defendant and third-party plaintiff; W. M. Kimball, New York City, of counsel.

Alexander, Ash & Schwartz, New York City, for third-party defendant; Joseph A. Cohen, New York City, of counsel.

COOPER, District Judge.

These actions arise out of personal injuries allegedly sustained by plaintiff Joseph Skibinski.

His complaint alleges that on November 24, 1958 while in the employ of a stevedoring company, International Terminal Operating Co. (hereinafter I.T.O.), he was injured aboard the S.S. Madaket, a vessel owned and operated by defendant Waterman Steamship Corp. (hereinafter Waterman). Skibinski further alleges that his injuries, incurred in furtherance of Waterman's business, were due to the unseaworthiness of the vessel, its appliances and parts and the negligence of Waterman, its agents, servants and employees.

Waterman's answer denies negligence and unseaworthiness and asserts by way of affirmative defense that any injuries received by Skibinski were due to (1) his contributory negligence and (2) negligence of persons for whose conduct defendant is not liable.

Waterman impleaded I.T.O. as third-party defendant alleging that if the acts of negligence and improper conditions averred by plaintiff did occur, they were created and permitted to exist by failure of I.T.O. to perform its contractual duties—a breach of I.T.O.'s warranty of workmanlike service. Waterman thus seeks indemnity if held liable in the main action.

I.T.O.'s amended answer denies responsibility for the accident and liability to indemnify Waterman. In addition, it asserts two counterclaims: (1) against plaintiff, on the theory that plaintiff was primarily at fault and should indemnify I.T.O. in the amount, if any, for which it is held accountable to Waterman and (2) against Waterman, on the theory that Waterman was at fault, breached its

warranty of seaworthiness and thus should indemnify I.T.O.

Trial commenced before this Court and a jury on December 21, 1964. On December 29, when proof on the main action was completed, all counsel stipulated in open court to waive trial by jury. This Court assumed the responsibility of trier of fact and the jury was dismissed. Further proof, the parties agreed, as to the indemnity claims is to be continued after the Court determines the merits of the main action.

### FACTS

A one ton steel ladder struck Joseph Skibinski while he was working in the depths of the hold under Hatch #4 of the S.S. Madaket on November 24, 1958. The injuries which befell him were not the result of an honest mistake in judgment or mere negligence, but rather, as shipowner's counsel conceded and the record overwhelmingly establishes, stupidity—*"criminal stupidity"* in the use of ship's equipment as put in motion to lower the ladder into the ship's hold for rewelding to the ship's structure (Tr. 36).

The material facts are not in dispute. The S.S. Madaket docked at the National Sugar Refinery Pier, Long Island City, New York on November 19, 1958 to discharge a cargo of bulk sugar. The unloading process called for the use of payloaders to scoop sugar from the wings of the hold at Hatch #4 and deposit it into the middle of the hold where it would then be removed by clam-shell type buckets suspended from a shoreside crane. A stationary steel ladder, affixed to the ship's structure by welded steel brackets, stood vertically from the bottom of the aft end hold under the hatch to almost top deck. Payloaders would be unable to reach the bulk sugar in the wing section behind the ladder. I.T.O. thus sought and obtained ship's permission to temporarily remove the ladder in order to facilitate the unloading operation (Tr. 746).

It was for this purpose that Skibinski came on board the S.S. Madaket on Friday, November 21, 1958. Having received permission to use his welding equipment, he burnt off the ladder and brackets, and they were removed from the hold. Payloaders were brought in, and by the following Monday the sugar was discharged.

At approximately 8:30 a. m. on Monday, November 24, Skibinski returned to the vessel to reaffix the ladder to the ship's structure (Tr. 139). As required, he received from the ship permission to proceed with use of the welding equipment (Tr. 136–8, 140, 528, 534). No sugar was to be discharged from Hatch #4; the sole remaining job in the unloading operations was the lowering and rewelding of the one ton steel ladder (I.T.O. Exhibit I).

Three of the ship's officers were on duty at that particular time (Tr. 534–5). Their responsibilities consisted in part of checking to see that the stevedores removed the cargo without damage to the vessel (Tr. 517, 548, 558–9). One officer testified that he always closely observed longshoremen engaged in operating the ship's winches (Tr. 558).

After setting up the welding equipment, Skibinski went down into the hold to replace the brackets he had removed three days earlier (Tr. 209–212). At about 9:20 a. m. he finished welding the brackets and told (in what manner was not clearly established) a ship's mate that he should have the ladder sent down (Tr. 212–213).[1] The ladder had been hoisted to the main deck and laid between hatches four and five.

Topside, members of a four man deck gang employed by I.T.O., Perez, Scamporino and Vacante, were waiting at Hatch #4 to lower the ladder (Tr. 242). Not more than ten minutes before the time of the accident, which occurred between 10:00 a. m. and 10:30 a. m., they received orders to lower the ladder and

---

1. According to Skibinski he did not tell anyone from I.T.O. to lower the ladder (Tr. 43). Perez's and Scamporino's tes- timony to the contrary does not convince this Court. (Tr. 297–298, 392, 396, 411).

immediately began the necessary preparations (Tr. 301, 550).

The first problem, reduced to its simplest terms, was the part of the hatch opening through which the ladder would be lowered. The ladder was to be replaced at the aft end of the hatch. Beams which support the hatch's cover, however, had earlier been rolled back to the fore and aft ends. The space between the beam farthest aft and the aft end of the hatch made it impractical, in the judgment of stevedore's deck men, to lower the ladder at that point. Rather, they agreed on a "plan" of action (Tr. 305–09; 320). It consisted of: (1) lowering the ladder through the open middle section of the hatch; (2) laying it down flat on the bottom of the hold; (3) uncoupling the fastening mechanism by which it was lowered; (4) retrieving the fall; (5) lowering the fall again through the opening between the beams and the aft end of the hatch; (6) recoupling the fastening mechanism; (7) dragging the ladder to the aft end of the hold and lifting it into position (Tr. 244–5, 248–9, 252, 286, 361–4, 371, 403).

The second step in the preparations was to ready the fastening mechanism. The longshoremen found attached to the ship's winch located at Hatch #4 two married falls, two shackles, and an *open-mouth* or "S" shaped cargo hook. They unmarried the falls, uncoupled and placed aside the shackles and attached the cargo hook to a single fall. So attached, the hook and fall were brought over to the ladder. *Without any locking or steadying device, the open hook* was placed under the top rung of the ladder (Tr. 253–8), after which Scamporino, acting as winchman, raised the ladder and swung it into position over the center of Hatch #4. With Perez (alias "Speedy"

and "Petey") acting as his signalman,[2] Scamporino proceeded to lower the ladder (Tr. 316–7, 319–20, 322, 398, 400–02, 412). The use of the open mouth cargo hook for this purpose, conceded by Waterman to be tantamount to "criminal stupidity," created a danger to all those working in the hold below (Tr. 38–9, 276–8, 324–5, 405, 678–9).

Although counsel stipulated that the open mouth cargo hook was neither defective nor broken (Tr. 62), without a locking device, *it was patently unsuitable* for the purpose to which it was put.

At a point when Scamporino could no longer see the bottom of the ladder, which was then but two or three feet from the floor of the hold, he was given a signal by Perez to "come back," a stevedore term meaning "lower away" (Tr. 400–03, 406–7, 412). The ladder thereupon became disengaged from the open cargo hook, dropped against the wall of the shaft tunnel running fore and aft in the hold, and rebounded against Skibinski who was in the wings, bending over his tools in preparation for his task[3] (Tr. 87, 93, 214–217).

The use of the open mouth cargo hook and the falling ladder were proximate causes of plaintiff's injury. (Tr. 38–9, 671–2).

## LAW

### Warranty of Seaworthiness

The threshold question before this Court is whether plaintiff is entitled to the warranty of seaworthiness. Contrary to the contentions of Waterman and I.T.O., we find that he is.

I.T.O. in particular places great weight on United New York & New Jersey Sandy Hook Pilot's Assn. v. Halecki, 1959, 358 U.S. 613, 79 S.Ct. 517, 3 L. Ed.2d 541. It argues that Skibinski was

2. There is some conflict in the testimony as to whether a signalman was used in lowering of the ladder. Perez testified that neither he nor anyone else acted as signalman for Scamporino because Scamporino could see the bottom of the hold and therefore acted as his own signalman. Scamporino, on the other

hand, testified that Perez acted as his signalman and give him the order "come back." The Court accepts Scamporino's testimony.

3. Further findings relating to where Skibinski was standing when hit by the ladder are discussed under the heading "Contributory Negligence," *infra.*

aboard the S.S. Madaket to do a welding job requiring special equipment and a special license and, as in Halecki, was injured while performing work not traditionally done by seamen. As we see it, Halecki is inapposite to the case at bar.

In holding Halecki not entitled to the seaworthiness warranty, the Supreme Court did not find the use of specialized equipment by specially licensed workers the controlling factor. Rather, the Supreme Court pointed to a variety of circumstances undercutting the historic doctrine's applicability. For example, the work was so specialized that the repair yard had to subcontract the job to an electrical firm. Moreover, the work could be done only when the ship was "dead," with its generators dismantled and at a time when all members of the crew were off the ship. 358 U.S. 617–618, 79 S.Ct. 517, 3 L.Ed.2d 541. Such factors are absent here.

Also absent is the "dry-dock" situation where the ship is removed from navigation, a cardinal factor in other cases relied on by I.T.O. and Waterman to support their view that Skibinski is not entitled to the warranty of unseaworthiness. See West v. United States, 1959, 361 U.S. 118, 80 S.Ct. 189, 4 L.Ed. 2d 161; Roper v. United States, 1961, 368 U.S. 20, 82 S.Ct. 5, 7 L.Ed.2d 1; Guerrini v. United States, 2 Cir., 1948, 167 F.2d 352, cert. denied, 1948, 335 U.S. 843, 69 S.Ct. 65, 93 L.Ed. 393; Martini v. United States, 2 Cir., 1951, 192 F.2d 649, cert. denied, 1952, 343 U.S. 926, 72 S.Ct. 759. Those cases are not controlling here.

■ The relevant test, promulgated by the Supreme Court and adopted by this Circuit to determine whether plaintiff is entitled to the warranty of seaworthiness is: Was plaintiff on the day of the accident performing the "type of work traditionally done by members of the [ship's] crew." Seas Shipping Co. v. Sieracki, 1946, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099; Pope & Talbot, Inc. v. Hawn, 1953, 346 U.S. 406, 74 S.Ct.

202, 98 L Ed. 143; Alaska S.S. Co. v. Petterson, 1954, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798; West v. United States, supra; Lawlor v. Socony-Vacuum Oil Co., 2 Cir., 1960, 275 F.2d 599; Shenker v. United States, 2 Cir., 1963, 322 F.2d 622; Torres v. Kastor, 2 Cir., 1955, 227 F.2d 664. See Edelman, Maritime Injury and Death (1960) 176–7.

■ Thus, as was the case in Halecki, supra, 358 U.S. at 618, 79 S.Ct. 517, we are not concerned only with the title Skibinski held or the precise technology of the tools with which he labored, but rather with the nature of the work he did and its relation to the ship and the applicability of the historic doctrine of unseaworthiness. See Halecki v. United N. Y. & N. J. Sandy Hook Pilots Assn., 2 Cir., 1958, 251 F.2d 708, 711, rev'd and remanded on other grounds, 1959, 358 U.S. 613, 79 S.Ct. 517, 3 L.Ed.2d 541.

Skibinski was not on board the S.S. Madaket merely as a specialist to cope with the generic problems relative to maintenance and repair of the ship's structure, its navigation or propulsion facilities, or stowage. As with the longshoremen who ran the payloaders and the winches, so too, plaintiff was on board the vessel to facilitate and effect the unloading of sugar from the ship's hold.

■ In addition, I.T.O.'s own expert witness, William Wheeler, testified, and we so find, that it would be within the duty and function of a ship's crew as a matter of tradition and custom in the days of old, prior to the advent of steel ships and steel ladders, to remove or replace a ladder (whether made of wood or other construction) when necessary or desirable for purposes of loading or unloading cargo (Tr. 717–9. See also 763).

Working in the depths of the hold in furtherance of ship's business at the time of falling danger from above,

> [Plaintiff's] need for protection from unseaworthiness was neither more nor less than that of the stevedores then working with him on the ship or of seamen who had been or

were about to go on a voyage. All were subjected to the same danger. All were entitled to like treatment under law. Pope & Talbot, Inc. v. Hawn, supra, 346 U.S. at 413, 74 S. Ct. at 207)

Accordingly, applying the relevant test, we find that Skibinski (as was true of his fellow longshoremen who actually participated in the physical removal of cargo) performed work traditionally done by the ship's crew. In so doing, on a vessel moored in navigable waters over which the ship's crew had general control, he was entitled to the warranty of seaworthiness; we undertake to recognize it now in these proceedings.

## Seaworthiness

Waterman and I.T.O. argue that the stipulated facts, especially the concession that the cargo hook from which the ladder fell was neither patently nor latently defective, require a finding as a matter of fact and law that the vessel was not unseaworthy. We cannot agree. The circumstances of this case, quite the contrary, require a holding that the S.S. Madaket was in fact unseaworthy.

It is now well established that a shipowner is liable to indemnify a longshoreman for injuries caused by the unseaworthiness of a vessel. "A vessel's unseaworthiness might arise from any number of individualized circumstances. Her gear might be defective, her appurtenances in disrepair, her crew unfit. The method of loading her cargo, or the manner of its stowage, might be improper." Morales v. City of Galveston, 1962, 370 U.S. 165 at 170, 82 S.Ct. 1226 at 1229, 8 L.Ed.2d 412; see The Osceola, 1902, 189 U.S. 158, 159, 23 S.Ct. 483; Mahnich v. Southern S.S. Co., 1944, 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561; Seas Shipping Co. v. Sieracki, supra; Pope & Talbot, Inc. v. Hawn, supra; Boudoin v. Lykes Bros. S.S. Co., 1955, 348 U.S. 336, 75 S.Ct. 382, 99 L.Ed. 354; Crumady v. Joachim Hendrick Fisser, 1958, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413.

While the duty imposed upon a shipowner to furnish a seaworthy ship does not require maintenance of an accident free ship, Mitchell v. Trawler Racer, Inc., 1960, 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941; Guiterrez v. Waterman S.S. Corp., 1963, 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297, the shipowner is held to its duty of providing a seaworthy vessel even though the ship's unseaworthiness is created not by its own acts but rather by the acts or negligence of a third party specifically hired to do specialized work aboard ship (e. g. I.T.O.). Mahnich v. Southern S.S. Co., supra, Alaska S.S. Co., Inc. v. Petterson, 1954, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798; Rogers v. United States Lines, 1954, 347 U.S. 984, 74 S.Ct. 849, 98 L.Ed. 1120; Grillea v. United States, 2 Cir., 1956, 232 F.2d 919; Massa v. C. A. Venezuelan Navigacion, 2 Cir., 1962, 298 F.2d 239, cert. denied, 1964, 379 U.S. 914, 85 S.Ct. 262, 13 L.Ed.2d 186; Mosley v. Cia. Mar. Adra, S.A., 2 Cir., 1963, 314 F.2d 223, cert. denied, 1963, 375 U.S. 829, 84 S.Ct. 73, 11 L.Ed.2d 61; Reid v. Quebec Paper Sales & Trans. Co., Ltd., 2 Cir., 1965, 340 F.2d 34.

The non-delegable nature of the shipowner's duty to furnish a seaworthy ship requires, moreover, that shipowner cannot relieve itself of this responsibility merely by delegating the work to a third party (e. g. stevedore) not in its direct employ. Alaska S.S. Co. v. Petterson, supra; Rogers v. United States Lines; supra, Shenker v. United States, supra; Reid v. Quebec Paper Sales & Transportation Co., Ltd., etc., supra. The basic considerations underlying the non-delegable nature of shipowner's duty have been outlined by the Supreme Court:

> "[Shipowner] is in position, as the worker is not, to distribute the loss in the shipping community which receives the service and should bear its cost.
>
> * * * * * *
>
> "These and other considerations arising from the hazards which maritime service places upon men

who perform it, rather than any consensual basis of responsibility, have been the paramount influences dictating the shipowner's liability for unseaworthiness as well as its absolute character. It is essentially a species of liability without fault, * * * It is a form of absolute duty owning to all within the range of its humanitarian policy." Seas Shipping Co. v. Sieracki, 328 U.S. at p. 94, 66 S.Ct. at 877, 90 L.Ed. 1099. See Poignant v. United States, 2 Cir., 1955, 225 F.2d 595; Grillea v. United States, supra.

■ The concept of unseaworthiness and its non-delegable nature are, of course, relative, dependent for definition upon the particular facts of each case. Mosley v. Cia. Mar. Adra, S.A., supra.

Judge Learned Hand in Strika v. Netherlands Ministry of Traffic, 2 Cir., 1950, 185 F.2d 555, cert. denied, 1951, 341 U.S. 904, 71 S.Ct. 614, 95 L.Ed. 1343, held that longshoremen's use of two "bridles" instead of one in lifting a "pontoon" was unsuitable for that purpose and the ship thereby became unseaworthy. In Strika, the longshoremen crew was attempting to lift a heavy metal "pontoon" from the dock by fastening it with two "bridles" to the ship's winches, booms and falls. The "pontoon" fell, striking a longshoreman who was assisting in the operation. According to the Court's opinion:

> Each "bridle" consisted of two lengths of wire cable, each length having a hook at one end, and the other end being fastened to a single common ring. Each hook was passed into a slot at one corner of the "pontoon", and the common ring was passed into the hook at the end of the fall. In this way each "bridle" could lift the "pontoon" at two of its corners, and two "bridles" could lift it at all four corners. Instead of making the two rings fast to each other, so as in effect to make a single "bridle" with four lengths of wire, the rings were left separate

on the hook; and in consequence, after the winch had lifted the "pontoon" a short distance from the dock, it tilted, the two rings separated and one of them slipped out of the hook, dropping one end of the "pontoon". [185 F.2d at 556].

■ In Strika, improper use of "bridles," *themselves neither defective nor broken,* rendered the ship unseaworthy. Here, the misuse of an open cargo hook, conceded by shipowner to be *"criminally"* unsuitable to lower the ladder, renders the vessel unseaworthy. There are, moreover, additional factors not present in Strika which, coupled with the patently improper rigging, support the finding of unseaworthiness.

First, we are not presented with a situation where holding the ship unseaworthy would in effect require shipowner to supervise every minute phase or step in a large unloading operation. Here, no large unloading operation was taking place at Hatch #4—the only job to be done at the time and place of the accident was lowering and rewelding the ship's ladder to the ship's structure.

The job of lowering and rewelding the ladder, furthermore, was not one of the typical, routine and ordinary jobs of every day which take place during unloading of a sugar ship. Indeed, it had happened only once in four years in plaintiff's experience and only "several times" in the six years Chief Officer Fleming had served aboard the S.S. Madaket (Tr. 83-4, 528-30). The ship was not unaware of the unusual nature of this task; it had given special permission for the removal and its officers were on duty to watch the winches and check to see that the longshoremen did not damage the vessel.

Waterman and I.T.O. contend that this is a simple case of "operational negligence." They assert that the Court of Appeals for the Second Circuit in Puddu v. Royal Netherlands S.S. Co., 2 Cir., 1962, 303 F.2d 752, petition for rehearing in banc denied and reconsideration of denial of petition for rehearing

in banc, 1962, 303 F.2d 752, cert. denied, 1962, 371 U.S. 840, 83 S.Ct. 67, 9 L.Ed. 2d 75, has made plainly clear that "operational negligence" by the contract stevedore is of itself an insufficient basis to sustain a finding of unseaworthiness. See Spinelli v. Isthmian S.S. Co., 2 Cir., 1964, 326 F.2d 870, cert. denied, 1964, 377 U.S. 935, 84 S.Ct. 1338, 12 L.Ed.2d 298, rehearing denied, 1964, 377 U.S. 1010, 84 S.Ct. 1219, 12 L.Ed.2d 1058.

While our Circuit has stated that concept as an abstract proposition, and applied it to cases wherein the longshoreman's injury arises from stevedore's negligent performance of detailed phases of routine work, it has not summarily disposed of Strika. The sound reasoning there pronounced and recent dicta suggest that it is the particular fact pattern, such as here, which controls. See Reid v. Quebec Paper Sales & Trans. Co., Ltd., supra. Compare, DiSalvo v. Cunard S.S. Co., Ltd., S.D. N.Y., 1959, 171 F.Supp. 813.

Other authority relied upon by Waterman and I.T.O. is not dispositive. Unlike the instant case, in both Ezekial v. Volusia S.S. Co., 2 Cir., 1961, 297 F.2d 215, 91 A.L.R. 1013, cert. denied, 1961, 369 U.S. 843, 82 S.Ct. 874, 7 L.Ed.2d 847 and Guarrancino v. Luckenbach S. S. Co., 2 Cir., 1964, 333 F.2d 646, cert. denied, 1965, 379 U.S. 946, 85 S.Ct. 439, 13 L.Ed.2d 543, libelants injured themselves. Compare, Mosley v. Cia. Mar. Adra, S.A., 2 Cir., 1963, 314 F.2d 223, cert. denied, 1963, 375 U.S. 829, 84 S.Ct. 73, 11 L.Ed.2d 61 (possibility that libelant's own conduct was itself the proximate cause of the accident). Here, Skibinski, unaware of the "plan" adopted by his fellow longshoremen on the main deck above, had no way to ascertain or ameliorate from his position in the depths of the hold the dangerous condition created by the use of the open mouth hook to lower the ship's ladder.

In other cases, the mishap causing the accident occurred during a step or phase of a typical and routine stevedoring operation already in full progress. See

Spinelli v. Isthmian S.S. Co., supra, and Puddu v. Royal Netherlands S.S. Co., supra (both involving stevedore's *abuse* of equipment); see also, Berti v. Compagnie de Navigation Cyprien Fabre, 2 Cir., 1954, 213 F.2d 397; Ventrone v. United States, E.D.N.Y., 1955, 134 F. Supp. 169, aff'd, 2 Cir., 1957, 239 F.2d 862; Massa v. C. A. Venezuelan Navigacion, 2 Cir., 1964, 332 F.2d 779, cert. denied, 1964, 379 U.S. 914, 85 S.Ct. 262, 13 L.Ed.2d 186; Sullivan v. United States, S.D.N.Y., 1961, 203 F.Supp. 496 (wherein libelant had been warned to be alert for falling cartons). In none of these cases was there a finding, as here, of conduct by the stevedore tantamount to "criminal neglect."

As we see it, the concept of unseaworthiness as defined by the Supreme Court and applied to this Circuit, coupled with the non-delegable nature of shipowner's duty, necessitate a finding of unseaworthiness. Indeed, the historic function of the doctrine permits no other finding on the facts of this case.

The availability of shackles which, if used by the longshoremen, would have prevented the ladder from being disengaged does not alter our conclusion. In Strika, proper equipment was readily available to the longshoremen. There, they had to use only one "bridle" instead of two, or use the two with suitable attachment. Here, the shackles were placed aside. In action of concededly *"criminal"* proportions, an open mouth hook indisputably unsuitable to the task was used to lower the ship's ladder by the ship's winches, boom and fall. See Ferguson v. Moore-McCormack Lines, 1957, 352 U.S. 521, 77 S.Ct. 457, 1 L.Ed.2d 511; Michalic v. Cleveland Tankers, Inc., 1960, 364 U. S. 325, 81 S.Ct. 6, 5 L.Ed.2d 20; Grillea v. United States, supra; Street v. Isthmian Lines, Inc., 2 Cir., 1963, 313 F.2d 35, cert. denied, 1963, 375 U.S. 819, 84 S.Ct. 55, 11 L.Ed.2d 53. See also Ezekiel v. Volusia S.S. Co., supra 297 F.2d at 219 (Clark, J., dissenting); Mosley v. Cia, Mar. Adra. S.A., supra 314 F.2d at 230 (Clark, J., dissenting). Ship-

owner would have this Court find seaworthy an unseaworthy bit of rigging by casting it in a shroud of "operational negligence." We cannot adopt so narrow a construction of the prevailing law as shipowner's formulation envisages. To hold that inexcusable stevedore performance resulting in a situation fraught with danger (so fully realized here) absolves shipowner of liability would render helplessly impotent the staunch protection of non-delegable duty. See *Alaska S.S. Co., Inc. v. Petterson, supra.* With such hazardous limitations on responsibility, had stevedore used a "bridle" arrangement as in Strika or even hair wire, themselves neither defective nor broken, shipowner would be heard to claim that, under all the circumstances, his ship was reasonably fit. In view of the facts of this case, labelled by shipowner itself as amounting to *"criminal"* neglect, we cannot so find. We refuse to concede that Puddu v. Royal Netherlands S.S. Co., supra, holds to the contrary; nor does Grillea v. United States, supra, dictate otherwise. See Ferrante v. Swedish American Lines, 3 Cir., 1964, 331 F.2d 571, cert. denied pursuant to Rule 60, 1964, 379 U.S. 801, 85 S.Ct. 10, 13 L.Ed.2d 20; Thompson v. Calmar S.S. Corp., 3 Cir., 1964, 331 F.2d 657, cert. denied, 1964, 379 U.S. 913, 85 S.Ct. 259, 13 L.Ed.2d 184. See also Scott v. Isbrandtsen Co., 4 Cir., 1964, 327 F.2d 113. Cf. Arena v. Luckenbach S.S. Co., 1 Cir., 1960, 279 F.2d 186, cert. denied, 1960, 364 U.S. 895, 81 S.Ct. 222, 5 L.Ed.2d 189; McQuiston v. Freighters and Tankers S.S. Co., 5 Cir., 1964, 327 F.2d 746; Billeci v. United States, 9 Cir., 1962, 298 F.2d 703.

### Negligence

Ship's officers were on duty on the morning of the accident. Their permission was necessary before Skibinski could proceed. Third-mate Bishop observed the welding equipment being sent down into the hold at Hatch #4 (Tr. 548, 559). He was aware of the task to be performed. Nevertheless, according to his testimony, he neither witnessed the accident nor was in the vicinity of Hatch #4 for at least one half hour prior to the accident (Tr. 549–50).

Plaintiff has failed to show by a preponderance of the evidence that shipowner, despite its actual knowledge of stevedore's job to lower and reweld the ship's ladder to the ship's structure—far from a typical job in connection with an unloading operation—had actual knowledge of the "plan" for the lowering or the dangerous condition created by the improper use of the open mouth cargo hook.

Absent such actual notice of the dangerous condition which caused Skibinski's injuries, we are constrained on the facts of this case to hold that shipowner was not negligent. Albanese v. N.V. Nederl, Amerik Stooms, Maats, 2 Cir., 1965, 346 F.2d 481. "[A] shipowner who hires a qualified stevedore * * * is not bound to any duty of active supervision of the stevedore's work. * * *" Filipek v. Moore McCormack Lines, Inc., 2 Cir., 1958, 258 F.2d 734, cert. denied, 1958, 359 U.S. 927, 79 S.Ct. 605, 3 L.Ed. 2d 699.

Indeed, this Circuit has emphasized that, despite the non-delegable nature of shipowner's duty to supply a safe place to work, shipowner escapes liability for negligence even though its personnel observe stevedore's misdeeds. Berti v. Compagnie De Navigation Cyprien Fabre, supra, Filipek v. Moore McCormack Lines, Inc., supra; Gallagher v. United States Lines, Co., 2 Cir., 1953, 206 F.2d 177, cert. denied, 1953, 346 U.S. 897, 74 S.Ct. 221, 98 L.Ed. 398. See Oblatore v. United States, 2 Cir., 1961, 289 F.2d 400, cert. denied, 1961, 368 U.S. 881, 82 S.Ct. 132, 7 L.Ed.2d 81.

### Contributory Negligence

Waterman and I.T.O. contend that Skibinski's own negligence was a proximate cause of the accident. The argument is predicated primarily upon the testimony of Skibinski's fellow employee and job partner at the time, Herman Stuve, and the asserted natural inferences to be drawn from the location of plaintiff's injuries.

Stuve, an eye-witness, gave a statement to Waterman's investigator on the date of the accident (Tr. 353) and portions of his pre-trial deposition were read into the record (Tr. 571–3, Ex. E). His testimony upon the trial did not materially vary from his prior statements.

According to Stuve, while with Skibinski in the hold, he saw plaintiff take hold of the lower end of the ladder (which was suspended about two or three feet from the floor) when standing at about the middle of hatch area, saw him attempt to swing it into place near the brackets and heard him yell "come on back" (Tr. 571–3, 576, 582–4, 587). These acts, if they occurred, contravene the Maritime Safety Code (Tr. 689).

 Skibinski, on the other hand, testified on direct and cross examination that he did not have knowledge of the use of the open cargo hook or of the "plan" (Tr. 81–2, 86, 124–5, 322–4, 404); he was against the skin of the ship bending over to pick up his tools at the time of the accident, not in the middle of the hatch area (Tr. 88, 93, 214–7); he never touched the ladder (Tr. 94, 221, 225–8); he did not yell "come on back" (Tr. 223). According to his testimony, the ladder fell on him without warning or notice (Tr. 218–9).

Thus, the issue of contributory negligence (as with other phases of the entire trial record) is one of credibility for the trial court to determine. We paid particular attention to the demeanor of the witnesses. Skibinski's testimony was given forthrightly and with conviction. He gave the distinct impression of a cautious workman constantly alert for precipitous and unannounced perils inherent in his assignments. Stuve, on the other hand, was hesitant and his statements lacked the quality of certainty which would lead this Court to adopt his recollection of the events of November 24, 1958. This is not to say that Stuve's testimony was fabricated; rather, it was not rendered with conviction. The Court accepts plaintiff's testimony on this score.

Waterman and I.T.O. argue that the location of Skibinski's injuries gives rise to an inference contradictory to his testimony that at the time of the accident he was not in the middle of the hatch area. We find this argument unpersuasive. We would be piling inference upon inference to reach a conclusion contrary to the lessons of practical experience. In an accident of this nature, where Skibinski was thrown not less than four feet (Tr. 420–1), there is equal merit in recognizing that injuries such as those incurred here would result not only from plaintiff's direct contact with the falling ladder, but also from other contacts by him with the hold's floor or the side of the vessel (see Tr. 195–7).

 Accordingly, the Court finds from a quantitative and qualitative viewpoint based upon the entire record, employing those criteria in the pursuit of truth which the law endorses, that Waterman and I.T.O. have failed to sustain their burden of proof, by a preponderance of the evidence, that plaintiff was contributorially negligent.

### Damages

The evidence sustains plaintiff's claims for money damages for past loss of earnings, past hospital and medical care, and both past and future pain and suffering.[4]

### 1. Loss of Past Earnings

Solely due to the accident, Skibinski was admittedly out of work for a period of 62 weeks: 5 weeks in 1958, 52 weeks in 1959, and 5 weeks in 1960.

During 1958, up to the date of his injuries on November 24, Skibinski earned a total of $6,038.79 (Tr. 108–9). Employed by I.T.O. in the same capacity

---

4. By stipulation, I.T.O.'s lien for medical and hospital care provided plaintiff at its expense is in the amount of $2,410.79 (Tr. 235). The expert medical testimony establishes the permanency of plaintiff's injuries and, under the present state of medical science, treatment is limited to the temporary pain palliatives such as aspirin and whirlpool baths (Tr. 189).

in 1956 and 1957, he earned gross salaries of $7,205.11 and $7,362.14 respectively (Ex. 1, Tr. 108).

I.T.O. would compute plaintiff's loss of earnings by taking his average weekly earnings during 1958 (c. $128.50) and multiply that amount by total weeks lost (62), reaching an amount of $7,967 ($6,681.20 yearly).

 The trier of fact in determining loss of earnings, however, is not here limited to considering only the actual earnings of the 47 week period immediately preceding the accident. See Alexander v. Nash-Kelvinator Corp., 2 Cir., 1959, 271 F.2d 524, 527. Plaintiff is entitled to compensation in the amount he is reasonably certain to have earned during the time lost as a result of the accident, had he not been injured.

 Proper factors to be weighed, in addition to actual prior earnings, are plaintiff's work record, the manner in which he normally occupied his time prior to the accident and his earning capacity. Morover, in computing average weekly earnings, it is appropriate to determine them over a period not unreasonably related to the date of his injury.

In both 1956 and 1957, the total yearly salary paid plaintiff for work of the type done for I.T.O. in 1958 was greater than the amount now urged by I.T.O. as a proper measure of loss of earnings (Ex. 1). We find, for a steady and conscientious laborer such as Skibinski, 47 years of age when injured, that reliance solely on his average weekly salary in 1958 would be unreasonable.

It should be observed that since his return to work, on a different job assignment, plaintiff has earned an average weekly salary exceeding that earned in the years 1956, 1957 and 1958 (Ex. 1).

This tends to substantiate that, during the time lost as a result of the accident, Skibinski would be reasonably certain to have progressed in remunerative employment. See Faudree v. Iron City Sand & Gravel Co., W.D.Pa., 1962, 201 F.Supp. 447, aff'd, 3 Cir., 315 F.2d 647.

Accordingly, the Court is inclined to compute Skibinski's actual loss of earnings by reference to his average weekly earnings over the period January, 1956 to November, 1958, a period not unreasonably related to the date of the accident or the 63 weeks lost thereafter. During 1956, 1957 and 1958, his average weekly earnings were $136.44 (compared to the figure of $128.50 proffered by I.T.O.). See Porello v. United States, 2 Cir., 1946, 153 F.2d 605, 608, affirmed in part and reversed in part, 1947, 330 U.S. 446, 67 S.Ct. 847, 91 L.Ed. 1011.

 The Court thus finds that plaintiff is entitled to $8,459.28 (or $7,094.88 computed on a yearly basis) for loss of earnings directly resulting from the accident.

### 2. Pain and Suffering

Plaintiff was 53 years of age at the time of trial and had a life expectancy of 20.55 years (Tr. 235). We find that since the time of the accident in November, 1958, when he was 47 years of age, to the present, he has not been without pain caused by the accident for any substantial period; further, that he is reasonably certain to continue to experience such pain for the remainder of his natural life.

After being struck by the ladder and attendant severe pain, he did not lose consciousness; he received drugs while in the hospital to aid in reducing pain;[5] he experiences pain while walking or standing, even for relatively short peri-

---

5. The parties stipulated that Skibinski was an in-patient at St. John's Hospital for three periods: November 24 to December 24, 1958; February 3 to February 6, 1959 and March 23 to March 28, 1959. On those occasions, respectively, he left the hospital in a wheel chair with a cast on his right leg from thigh to toes; on crutches with a cast from his right knee to toes; and without a cast but on crutches. During the first stay in the hospital, he was awakened nightly for a substantial period for injections and embarrassed by his inability to make use of normal lavatory facilities.

ods of time; he is not without pain when working.[6]

It had not been until March, 1959, some five months after the accident that his cast was removed. Post-hospital treatment, under the supervision of Dr. Sarver up to March, 1960, included exercises and whirlpool treatments.[7]

■ Medical science, it appears, cannot alter by operation or treatment the permanency of the following injuries Skibinski incurred or otherwise than temporarily remove his incessant pain and suffering: (1) his right leg is shorter than his left leg by three-eighths of an inch and he will always walk with a limp; (2) actual wasting of the muscles of the right thigh and calf (one inch and three-quarters of an inch respectively); (3) inversion of right foot limited to fifty per-cent; (4) loss of bending capacity of fifty degrees in right knee; (5) scar from compound fracture; (6) swelling of knee, and displacement and bowing out of right femur, tibula and fibula. .

In addition to these physical injuries, we find that as a proximate result of the accident plaintiff can no longer participate in numerous activities which, before the accident, were an integral part of his daily life and brought an appreciable degree of delight and contentment.[8] Moreover he cannot walk more than six or seven city blocks or stand more than twenty minutes—in sharp contrast with his physical prowess theretofore—without suffering pain from swelling in his ankles.

Accordingly plaintiff is entitled to monetary compensation for pain and suffering, past and future, causally related to the accident.

### Conclusion

The motions for directed verdicts made by plaintiff, defendant and third-party defendant in the main action are denied.

Judgment on the main action is rendered in favor of plaintiff and against defendant. Determination of costs and counsel fees, if any, is reserved pending completion of trial and decision on the claim over.

Taking of further proof in this action by defendant against third-party defendant shall resume at a date and time to be appointed.

The foregoing opinion shall constitute partial findings of fact and conclusions of law.

Computation of total damages to be awarded is reserved pending submission by the parties, on three (3) days notice, of proposed findings of fact and conclusions of law, and additional memoranda, if any, within ten (10) days from the filing date hereof.

---

6. Skibinski testified at trial that since the accident he has been unable to work aboard a ship or do the type of work he was accustomed to doing (Tr. 110).

7. The record does not provide a basis for an award of damages for future medical or hospital care.

8. Plaintiff could no longer participate in sports with his children, roller skate, bowl or dance. At the time of the accident, he was taking special dancing lessons.